NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WIX CORPORATION, Respondent.

No. 9283.

United States Court of Appeals Fourth Circuit.

Argued April 24, 1964.

Decided Aug. 3, 1964.

Melvin Pollack, Atty., N.L.R.B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Bernard Wray, Atty., N.L.R.B., on brief), for petitioner.

J. W. Alexander, Jr., Charlotte, N. C. (Ernest W. Machen, Jr., and Blakeney, Alexander & Machen, Charlotte, N. C., on brief), for respondent.

Before HAYNSWORTH, BRYAN and BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge.

The Board petitions for enforcement of its order of January 29, 1963 against the Wix Corporation, a manufacturer of oil and air filters, at Gastonia, North Carolina, pursuant to § 10(e) of the National Labor Relations Act, 29 U.S.C. § 151, et seq. The Board found Wix in violation of § 8(a) (3) and (1) on the basis that it had discharged five employees and transferred two others to less desirable jobs because of their union activities. In addition, Wix was found to have violated § 8(a) (1) by various coercive acts including "threats of economic reprisal, promises of economic benefit, and inducing previously unlawfully discharged employees to waive their rights to reinstatement."

Our decision varies in the several instances. We examine each employee's case and determine the enforceability of the order—upon the evidence—in respect to the individual employee. The discussion recognizes that the Board has accepted the Examiner's findings and treats them as its own.

Prior to the present proceedings, the Board on August 17, 1961, declared Wix in violation of § 8(a) (3) because of the illegal discharge of seven employees, and of § 8(a) (1) because of coercive acts and threats calculated to discourage the employees' union activities. Subsequently, this court granted only partial enforcement of the Board's determination, since "many of its crucial findings have no support in the record considered as a whole". NLRB v. Wix Corporation, 309 F.2d 826 (4 Cir. 1962). However, as a result of the Board's August 17th decision and while the case was still before us, Wix offered reinstatement to all 7 of the alleged discriminatees. Pursuant to these proffers, Carl Hoyle and Charles E. Ross returned to work in September 1961. Immediately an intensified campaign for the organization of the employees was resumed on behalf of the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, UAW–CIO. It is from this point that the current infractions are charged to Wix.

## I. The Discharges and Transfers

### (a) Employee Daniels

He was discharged on September 14, 1961. The explanation was that Daniels had maliciously destroyed company property. Part of his job, on the last phase of the assembly line, was to clean filters with an air hose as they passed by on a chain-driven conveyor belt. On the morning of his discharge, the production line had been suspended because of a problem in the packaging department. When it resumed operation the hose was lying in a heap close to the chain. As Daniels reached to pick it up, the hose caught in the chain. Instead of cutting off the machinery immediately at a nearby switch, he tugged on the hose until it was cut in two. A 30–45 minute shutdown of the line ensued while the hose was repaired. Informed of the incident, the foreman of the packaging department dismissed Daniels. His decision was approved by Smith, the personnel director, who later that morning instructed Daniels to collect his wages.

There was other objectionable conduct on the part of Daniels. On this particular morning, despite previous warning, he had engaged in loud and frequent pro-

fanity. Moreover, he had "roamed" about the factory. Nevertheless, his discharge was placed solely upon the accusation of deliberate destruction of the machinery.

■ Concededly, Daniels had been an active unionist. Whether or not the tangling of the hose with the chain was simply a mishap, the result of anger, or intentional we are not in a position to judge. Hence the finding of the Board of an accident cannot be rejected. However, the further conclusion that the discharge was due to the unionism of Daniels cannot stand without a further finding that the employer did not with reason think it was only an accident. In consequence the order of the Board for restoration of Daniels with the stated monetary provision should not be sustained.

Likewise, the evidence does not warrant the finding that Personnel Director Smith violated § 8(a) (1), in that he endeavored to induce Daniels to withdraw a complaint he had filed with the Board. Daniels' testimony is so riddled with contradictions—hardly inadvertent —that his word upon the inducement is utterly unacceptable. Nor does the other evidence on this head justify the Board's conclusion.

### (b) Employee Bridges

He was released on September 25 for "absence without notification". After the September reinstatements, Bridges resumed his union advocacy with such vigor that he frequently wore as many as 10 union buttons. He had received a warning slip in July—several months before his renewal of union promotion— which read: "Employee has had verbal warnings about absences, and his attitude toward jobs other than his regular job. If attendance and attitude isn't improved, dismissal will result." The admonishment was discredited by the Examiner as being "of vague content". There is also evidence that at one point during the summer, a Company supervisor advised Bridges to stop wearing the union buttons. The Examiner also found from conflicting testimony that another foreman had referred to him as a "union ringleader".

Bridges was absent from work on Friday, September 22, and testified that he sent a message of his illness through a fellow employee. His supervisor conceded that he was informed of Bridges' absence by this employee but that he considered it unsatisfactory because no reason was revealed. When Bridges reported to work the following Monday, he was discharged without further inquiry.

■ The Examiner, relying on the circumstantial sequence of his release— immediately following Bridges' vigorous return to union compaigning along with the remarks of the two foremen—found the Company's "assigned ground for Bridges termination a transparent pretext" and that the real cause lay in his union participation. In addition, he found the comment on Bridges' union buttons to be a violation of § 8(a) (1). It cannot be said that the Board was without support in its conclusions, and we will enforce the order directing his reinstatement with remuneration.

### (c) and (d) Employees Hoyle and Ross

Hoyle and Ross were dismissed on September 29, 1961 for breach of the Company's rule prohibiting one employee to punch another's time card. Both had been ousted previously but had later been reinstated by the Board in its August 1961 order. While that order was here for enforcement, the Company reaccepted them, as already noted. Subsequently to these events and after the Examiner's report in the instant controversy, the finding as to Ross in the August 1961 order was overturned by this court.

It is undisputed that on the evening of September 28, Hoyle "punched out" Ross' time card while the latter went out another exit to fetch his car. Again the next morning Hoyle punched Ross' card, although Ross was not in the plant. Both were discharged following verification of the incidents and their failure to give a plausible excuse.

However, the Examiner was impressed by testimony that such practice, sometimes in the presence of supervisors, frequently occurred without reprimand. Also on the basis of conflicting testimony, the Examiner found that on the evening of the 28th Hoyle had also punched the time card of employee Waters who was not censured by the Company. Personnel Director Smith testified that Waters had flatly denied this charge. Neither Hoyle nor Ross unequivocally testified that Hoyle in fact punched the time card of Waters. The Examiner also relied on the fact that both Hoyle and Ross were leading union proponents and had been previously relieved.

■ Certainly this differing evidence is inadequate to support the Board's finding that Hoyle and Ross were fired for union preference and activity. We refuse to enforce the order requiring their reinstatement.

### (e) Employee Jenkins

Jenkins' employment with Wix was terminated on October 16, 1961. He had been a spot welder for 4 or 5 years, occasionally working in other capacities. About 5 months before his lay-off, Jenkins requested to be transferred from welding because it bothered his legs. After trying several other places, he successfully sought return to spot welding. In September 1961, about the time that he began wearing union buttons, Jenkins was permanenly assigned to the slitter machine. This work required him to bend over a low table while stacking metal cuts. Jenkins complained that the constant bending agitated his back, and he asked either that the slitter table be raised or he be changed again. Personnel Director Smith advised Jenkins that no other work was available but gave him a week off while other job possibilities were investigated. Upon his return Jenkins was informed that no other positions were then open. Faced with returning to the slitter, Jenkins asked to be laid off rather than fired, but his supervisor replied that he was not going to do

any more favors for him. He was laid off by Smith "for not being able to do his job".

Section 8(a)(1) breaches were attributed to several statements made by Company agents in addition to the ones just noted. Upon displaying the union buttons in September, one of the supervisors remarked to Jenkins, "I believe you are kind of messing up." In answer to his request to be laid off rather than fired, his own supervisor observed that Jenkins would probably have to find work in another State.

■ Reinstatement was ordered by the Board. We find no ground for this conclusion, and the order will not be enforced. The remark about leaving the State for work made to him by his own supervisor was a § 8(a)(1) transgression; the others cannot be so sustained.

### (f) Employee Schronce

Schronce had been continually employed on a particular punch press for over a year. The day after he displayed union buttons, he was assigned to another press. Following his protest that he was being "persecuted" and that he would not quit, Schronce was returned to his regular press on the next day. The Company asserted that the shift was designed to train a replacement. The Examiner determined that the one day transfer was designed to penalize Schronce. Certain remarks and conversations between Schronce and Company officials, in particular a suggestion that he post on the bulletin board a repudiation of the union, were also treated as offensive to the Act in that they constituted an "interference, restraint and coercion of employees".

■ The § 8(a)(3) charge is unfounded and will not be enforced. However, we agree that the remarks made by the Company officials violated § 8(a)(1).

### (g) Employee Truett

■ Truett, a spot welder for 5 or 6 months, was transferred to the dial tables in late September. He had resumed his union activities and exhibition of a union badge earlier in the month.

According to Truett, his supervisor's explanation for the change was that he thought him "dissatisfied". Foreman Rush told Truett that things could be worse—implying discharge—and that things might be worked out if he changed his attitude about the union. At a later date, Rush also interrogated Truett concerning a union meeting that he had attended. Based largely on these findings, the transfer of Truett from spot welding to the dial tables was considered a violation of § 8(a) (3). We think this finding unsustained. The statements of Foreman Rush were found to have infringed § 8(a) (1), and should be enforced.

## II. *Alleged Reinstatement Waivers*

After the August 1961 order of the Board, it questioned the compliance by the Company with the order. Proof was demanded, and in response the Company filed a number of affidavits of the dischargees. The purport of these was that reinstatement had been offered and that payments had been tendered on account of accrued wages. The Company had declined to pay the whole of the wages claimed until those sums had been fixed by the Board, taking the position it could not make this adjustment finally without the approval of the Board.

These affidavits, the Board charged, were in fact releases or waivers purposed to destroy all obligation of reinstatement. We have examined these instruments and the circumstances under which they were obtained, and we find no support for this conclusion of the Board.

To recapitulate, we will enforce so much of the order of the Board as requires the Company to cease and desist from discouraging membership in the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, UAW–CIO or in any other labor organization, and from interfering with, restraining or coercing its employees in any manner in the exercise of their rights guaranteed in Section 7 of the National Labor Relations Act. Furthermore, the order for the reinstatement of Bridges will be enforced; it will not be enforced in respect to Daniels, Hoyle, Ross, Jenkins, Schronce and Truett.

Posting of notices as directed by the Board, subject to the changes just indicated, will be required. Likewise notification shall be given to the Regional Director of what steps have been taken by the Company to comply with the orders of the Board as amended.

Enforcement granted in part; refused in part.

J. SPENCER BELL, Circuit Judge (dissenting).

I disagree with my brethren. I think there is evidence to support all of the Board's findings. I do not think we should take what pleases us and reject what does not.