NATIONAL BOOK CONSOLIDATORS, INC., Petitioner in 81–1588,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner in 81–2295,

v.

ADP TRANSPORT CORP., Respondent.

Nos. 81–1588, 81–2295.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit Rule 12(6) November 30, 1981.

Decided Feb. 23, 1982.

Stephen A. Ploscowe, Theodore M. Eisenberg, Jerold E. Glassman, Grotta, Glassman & Hoffman, P.A., Roseland, N. J., for petitioner National Book Consolidators, Inc.

John D. Burgoyne, Asst. Gen. Counsel, Michael G. Okun, William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, N. L. R. B., Washington, D. C., for N. L. R. B.

Before ALDISERT, ROSENN and WEIS, Circuit Judges.

## OPINION OF THE COURT
PER CURIAM.

Judgment based upon default is a procedural mechanism that can have serious adverse effects on the nonresponding party. The harshness of this device is vividly demonstrated in this case where the National Labor Relations Board entered judgment against respondents for failing to file an answer to a complaint issued against them. The Board thereupon ordered, among other things, that the company reopen its facility, rehire terminated employees, and awarded backpay to the employees. This was done despite the fact that the union that filed the original charge had requested that it be withdrawn.

At the instance of Local 804, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, General Counsel of the National Labor Relations Board issued a complaint on August 3, 1979, charging respondents APD Transport Corporation and its alleged alter ego, National Book Consolidators, Inc., with unfair labor practices. The complaint maintained that APD wrongfully ceased operations in New York, moved to New Jersey, and carried on its activities there under the name of National Book Consolidators, Inc.

Mr. Irwin Horowitz, counsel for the respondents, wrote to the regional director of the NLRB on August 16, 1979, asking for an extension of time to file an answer. He explained that his request was "predicated upon the fact that the matter has been settled and appropriate papers are now being drawn" to reduce the terms to writing. In response, the regional director issued an order which read: "Counsel for Respondent, by letter, requested an extension of time to file an Answer because of the probability of a settlement between the parties, and the matter having been duly considered, IT IS HEREBY ORDERED that the time for filing an Answer ... be ... extended to September 16, 1979."

Respondent's counsel later requested an additional ten day extension by telephone. He wrote a letter on September 17 to confirm the telephone conversation with the regional director as to the agreement to enlarge the time. In it, Mr. Horowitz also stated, "We hope to have the settlement papers executed by all parties prior to that date." The regional director then issued an order in the same form as that signed in August, extending the time for filing to September 27, 1979.

On October 26, 1979, Ms. Marguerite R. Greenfield, counsel for General Counsel, wrote to respondent's lawyer and stated that unless an answer was filed by October 31, she would seek summary judgment. On October 30, 1979, Mr. Horowitz, in a letter to General Counsel's office, replied:

"James V. Morgan, the attorney for the Petitioner [Local 804] in the above-captioned matter has advised that the Complaint would be withdrawn. The Settlement Agreement has been signed as per our telephone discussions.

"I would appreciate it if you would mark your records accordingly."

Counsel for General Counsel did not respond to this letter until January 3, 1980, when she telephoned Mr. Horowitz and as she conceded, "[A]t which time I advised him of the Charging Party's continued failure to request withdrawal and of my intention to file immediately for summary judgment."

On January 8, 1980, counsel for Local 804 sent a letter to the regional director, asking that the charges against respondent be withdrawn. The letter also set out the general terms of the settlement which had been reached. On that same day, however, General Counsel mailed a motion for summary judgment to the Board in Washington. The union's letter had not yet been received when the motion was submitted.

Even after receipt of the withdrawal notice, however, General Counsel's office did not rescind its action in asking for summary judgment. To the contrary, on February 12, 1980, Ms. Greenfield sent a letter to the Board opposing the union's withdrawal request. In it, she asserted for the first time in any record document "[t]hat a settlement agreement between the parties had been executed is no defense to Respondent's failure to file an Answer, particularly where the General Counsel is not a party to the settlement and where Respondent, for three (3) months after its execution, despite repeated extensions of time, filed no Answer and made no attempt to otherwise resolve the matter."

On February 15, 1980, respondent filed an answer, accompanied by a letter stating:

"This Answer would have been filed within time, and prior to this date, had it not been for the fact that the issues set forth in the Complaint and Notice of Hearing had been resolved in October, 1979, by the signing of a formal settlement agreement ... On a number of occasions we have reported to your office that a settlement had been agreed upon and signed and on a number of occasions the attorney for the Union, James V. Morgan, has requested that the Complaint be withdrawn."

Horowitz's firm then asked that a meeting of counsel be held under the auspices of the regional director to resolve the matter, a suggestion that was apparently declined.

On that same date, counsel for the union wrote to the Board, reaffirming that the company's counsel had satisfactorily negotiated a settlement with the union. The union's position was that:

"Respondent, in good faith, believed that settlement with Local 804 and withdrawal of the charges would make further proceedings, including an answer to the complaint, unnecessary ... Under the circumstances, it would be unfair and inequitable to deny respondent an opportunity to answer the complaint and to defend the case on the merits. For the foregoing reasons, Local 804 urges the Board not to grant the motion for summary judgment herein upon default."

Two weeks later, the Horowitz firm withdrew its appearance. Present counsel was substituted and undertook informal, although ultimately unsuccessful, efforts to

have the motion for summary judgment withdrawn. Additional motions and responses were filed by the parties over a period of months through September 17, 1980. Included among the documents filed was an affidavit by Mr. Horowitz, in which he asserted that counsel for the General Counsel had led him to believe that if APD and Local 804 settled their differences, National Book Consolidators would be unaffected by the proceedings and would not be required to file an answer. He also stated that he had advised counsel for General Counsel "at all times ... that National Book Consolidators, Inc. had no substantive knowledge of the basic dispute between APD and Local # 804 and indicated that National Book Consolidators, Inc. denied all of the allegations against it in the Complaint."

Other material in the record indicates that whether National Book Consolidators is actually the alter ego of APD Transport is a strongly contested factual issue. In addition, it is alleged that APD was not guilty of any wrongdoing. The record does demonstrate therefore the assertion of a meritorious defense on the substantive issues. Moreover, it is argued that dire consequences will befall National Book Consolidators from the remedy the Board imposed after the default, since APD is defunct.[1]

Nevertheless, the Board granted summary judgment based on respondent's failure to file a timely answer, stating, "Although respondent's motion and opposition to the Motion for Summary Judgment were filed in a timely fashion, Respondent gave no explanation for its failure to file a timely answer to the complaint." Respondent's motion for reconsideration was later denied.

As we held in *Livingston Powdered Metal Company v. NLRB*, 669 F.2d 133 (3d Cir. 1982), the Board must utilize a "good cause" standard in determining whether to accept filing of an answer. We are in agreement with the statement of the court in *NLRB v. Zeno Table Co.*, 610 F.2d 567, 569 (9th Cir. 1979), that "[t]he purpose of the 'good

cause' standard ... is to ensure that the Board makes decisions on the merits despite technical and inadvertent noncompliance with procedural rules." (footnote omitted).

The Board has imposed a far-reaching remedy upon National Book Consolidators here, based solely on the conclusion that it is the alter ego of APD Transport and, therefore, responsible for that company's alleged unfair labor practices. Although National Book Consolidators has advanced strong defenses to those contentions, they will go unheard under the Board's default order.

This case is unique in that Local 804, an adversary, has nevertheless come to respondent's defense and urges that if the settlement is not acceptable, the matter be decided on the merits. That advocacy in itself weighs heavily in favor of accepting the answer for filing.

We are puzzled by the Board's comment that respondent gave no explanation for the failure to file an answer. The documentary evidence in the form of correspondence and orders of the regional administrator demonstrates that the reason the extensions in time were granted was that settlement negotiations were being conducted. It was not until February 12, 1980 that General Counsel first asserted that execution of a settlement agreement was not a defense to failure to file an answer. If this had been the position of the Board, it should have so stated in the autumn of 1979 and refused its consent to the delay in filing an answer.

Granting time extensions because of assertions of probable settlement unquestionably could be taken as an acknowledgement that an answer would be unnecessary if the case were in fact amicably resolved. The position taken by General Counsel in February 1980 was inconsistent with the conduct of the regional director in the early stages of the proceeding, and should have been recognized as such by the Board.

---

1. The president of APD wrote to the clerk of this court stating that the company is defunct, without assets, and lacks means to retain counsel or comply with the Board's order.

■ We are even more perplexed by Ms. Greenfield's assertions that respondent "filed no Answer and made no attempt to *otherwise resolve the matter.*" (emphasis added). A negotiated settlement, under terms the union conceded were the best obtainable under the circumstances, clearly is evidence of a successful attempt to resolve the matter. Counsel for respondent continually kept the General Counsel's office informed of the progress of the settlement negotiations, and there is no basis for the contention that respondent made no attempt to resolve the matter.

■ After counsel for General Counsel wrote on October 26, 1979, that an answer must be filed, respondent replied by stating that the union would be withdrawing its complaint. General Counsel did not take exception to this letter, a silence which would reasonably indicate acquiescence in the belief that an answer would not be necessary in this event. Similarly, Ms. Greenfield stated that when she called Mr. Horowitz on January 3, 1980, she complained that the union had not yet filed its request for withdrawal. Thus, it was not the respondent's lack of diligence that triggered the filing of the summary judgment motion in January, but rather the union's failure to file its withdrawal, a matter which it remedied within a few days.[2]

■ In sum, Respondent was lulled into the belief that a settlement would be acceptable in lieu of an answer. It is true that Respondent Book Consolidators could have avoided the problem if it had filed an answer without waiting for a settlement by APD. But, under all the circumstances here, particularly where the reason for lack of compliance with the rules was not respondent's inaction but that of its adversary, as well as the regional director's conduct, "good cause" was shown to justify the late filing. A default should not have been entered and instead the matter should have been resolved on the merits. Injustice through a default is a fault that must be avoided by courts and agencies alike.

Under the Board's procedure, the failure to file a timely answer produces a summary judgment. In the district court by contrast, generally after entry of a default, notice is given of a hearing to determine the scope of relief. At that time even though liability has been established, the defaulting party is given an opportunity to be heard on either the amount of damages or the scope of injunctive relief.

■ Thus, the entry of default by the Board is an even more drastic step than that which occurs in a trial court. Consequently, when seeking to invoke the equitable powers of this court to issue an enforcement order in cases of this nature, the Board may expect a searching inquiry from us. If the district court processes can tolerate the requirement that a defaulting party be given an opportunity to be heard on the scope of relief, we have difficulty in understanding why the Board's could not as well.

The inflexible attitude of the Board here has unfortunately caused this dispute to linger on too long. Given the parties' demonstrated willingness to engage in good faith negotiations, it seems likely that the matter could have been settled in February 1980, had the Board accepted respondent's suggestion to conduct a settlement conference.

Because we conclude that it was error to refuse to accept the answer, we do not meet respondent's contention that the Board should have approved the settlement negotiated by the parties on October 4, 1979.

The petition for review will be granted and the cross petition for enforcement will

---

2. The reason for the union's delay is not demonstrated in the record. We do note, however, that the fund for settlement was created by assignment of accounts due APD and other money placed in escrow. Because APD was going out of business, it may be that the financial arrangements were difficult to conclude promptly. In its letter of February 15, 1980, counsel for the union wrote, "Local 804 believes that the agreement it negotiated with APD is the best obtainable under all the circumstances of this case. Counsel for the General Counsel's wholly unrealistic position seeking remedies which we believe will prove unenforceable can only serve to frustrate and unnecessarily delay resolution of this matter."

be denied. The case will be remanded to the Board for further proceedings consistent with this opinion.

ROSENN, Circuit Judge, dissenting.

This petition for review and cross-application for enforcement of an order of the National Labor Relations Board is one of several recent cases in which this panel has considered default judgments entered by the Board. By unanimous decision, we denied enforcement in the other cases because one involved the Board's erroneous interpretation of one of its rules and in the other the default was minimal and not prejudicial.[1] I consider this case different because the Board's rule pertaining to the timely filing of an answer to a complaint charging an unfair labor practice is clear. The failure to answer in this case was not inadvertent; it was either sheer indifference or inexcusable neglect. I therefore respectfully dissent.

### I.

The complaint in this case charges serious violations. The timely processing and disposition of the charges was important, especially to the more than fifty employees alleged to have been discriminatorily discharged. The Board's rule requires[2] and the complaint *specifically instructed* the Company Respondent that an answer to the complaint be filed with the Regional Director within ten days of service thereof; otherwise, "the allegations in the complaint shall be deemed to be true and may be so found by the Board."

A brief chronology of the proceedings before the Board may place the issues in proper perspective. Following the issuance of the complaint on August 3, 1979, Company counsel requested two extensions of time—of thirty and ten days, respectively—within which to file an answer, asserting the possibility of a settlement between ADP and the charging party, Local 804 of the Teamsters Union. The Regional Director obligingly granted each request, setting the final date for the answer at September 27, 1979. The Company's counsel filed no answer by that date. One month later, October 26, 1979, an attorney for the General Counsel wrote the Company[3] informing it that, despite the two extensions of time, no answer had yet been filed and that unless the Board received an answer by October 31, the General Counsel planned to file a motion for summary judgment. Again, the Company failed to file an answer, nor did it make any other attempt to resolve the issues raised in the complaint. Instead, by letter dated October 30 it summarily informed the Board that a "settlement agreement [with the Union] had been signed as per our telephone discussions." It did not, however, supply the Board at this time with any evidence of the execution of an agreement, or of its terms.

In the absence of an answer, a request for withdrawal of charges, or other disposition of the case, counsel for the General Counsel telephoned the Company on January 3, 1980, and informed it that she intended to file a motion for summary judgment immediately. Again, the Company did not file an answer. On January 8, 1980, over five months after the issuance of the complaint, no answer having been filed, the General Counsel mailed a motion for summary judgment to the Board. Counsel for the Union on the same date wrote to the Regional Director and requested that the charges be withdrawn, asserting that a "stipulation of settlement" had been reached with "the employer parties." Counsel's letter, however, does not indicate whether he enclosed a copy of the stipulation of settlement.

---

1. These cases were *Kessler Institute for Rehabilitation v. NLRB*, 669 F.2d 138 (3d Cir. 1982), and *Livingston Powdered Metal, Inc. v. NLRB*, 669 F.2d 133 (3d Cir. 1982).

2. 29 C.F.R. §§ 102.20 and 102.21 (1981).

3. The communications between representatives of the General Counsel and the Company were with the Company's counsel. Unless specifically noted otherwise, I shall refer to the Company's counsel in this dissent as "the Company."

On January 16, 1980, the Board issued an Order Transferring the Proceeding to the Board and Notice to Show Cause. This order, served on the Company, advised it that the General Counsel sought summary judgment and a remedial order because the Company had failed and refused to file a timely answer as required by the Board's rules and despite the repeated opportunities offered by the extensions of time. The order notified the Company that on or before January 30, 1980, written cause had to be filed with the Board showing why the Motion for Summary Judgment should not be granted. Thereafter, the Board granted two requests of the Company and the charging union party to extend the time to respond to the Show Cause Order. The Board set February 20, 1980, as the final date for filing the response and advised the Company that no further extension would be granted. On February 7 the Company's attorney telegraphed a response which simply denied all of the substantive allegations of the complaint and requested that the Motion for Summary Judgment be dismissed. He offered no explanation for the failure to file a timely answer to the complaint. On February 15, 1980, the Company finally sent a formal answer to the Regional Office.

By letter dated February 12, 1980, the General Counsel forwarded to the Board the Union's January 8 letter requesting withdrawal of the unfair labor practice charges and a copy of the private settlement upon which the withdrawal request was based. The letter stated the General Counsel's opposition to acceptance of the withdrawal request on the ground that the settlement did not address or remedy the unfair labor practices alleged in the complaint, particularly the alleged illegal discharge of more than fifty of the Company's employees who had made claims for reinstatement and back pay.

On May 30, 1980, over three months after the February 20 deadline for responding to the Order to Show Cause, new counsel for the Company filed a motion for leave to respond to that order. That motion alleged that no timely answer had been filed because counsel for the General Counsel had advised the Company that no answer would be necessary if the parties reached a written settlement agreement and submitted it, as well as a withdrawal request, to the Board. The General Counsel filed a reply urging the Board to dismiss the motion because it was untimely or, alternatively, because the Company had not shown good cause for its failure to file an answer. On June 4, 1980, the Company filed a new motion requesting that the Board dismiss the complaint because of the private settlement. The General Counsel filed an answer urging the Board to deny the motion because "the proffered non-Board settlement agreement ... fails to address, or to remedy in any respect, the unfair labor practices alleged in the complaint." The Board found merit in the General Counsel's position.

In these circumstances, the Board found the May 30 motion untimely and denied it. The Board also noted that even were it to consider the untimely May 30 response, it would deny it as without merit "[i]n view of the failure of the settlement agreement to provide a substantial remedy for the unfair labor practices alleged in the complaint." Only at this point and time were the allegations in the complaint deemed to be admitted and found to be true by the Board and the motion for summary judgment granted.

## II.

In *Livingston Powdered Metal, Inc. v. NLRB*, 669 F.2d 133 (3d Cir. 1982), we held that in the circumstances of that case only "good cause" would excuse the company's failure to file a timely answer. The Company argued in its brief on this appeal that it demonstrated good cause because (1) it "orally denied the allegations of the complaint in conversations with the Board," and (2) "substantial evidence on the record as a whole does not support the Board's finding that [the Company] did not show 'good cause' for the filing of a late answer." I cannot agree.

First, I can find nothing in this record to support the argument that the Company orally denied the allegations of the complaint. The Company does not point to any specific conversation with the Board or with counsel for the General Counsel in support of this assertion. Second, the Act specifically addresses the right "to file answer." 29 U.S.C. § 160(b) (1976). The Board's regulations similarly speak in terms of filing an answer in which the respondent "shall specifically admit, deny, or explain each of the facts alleged in the complaint." 29 C.F.R. § 102.20 (1980). The complaint contained specific directions to the Company to *file* an answer. Counsel for the General Counsel patiently and vainly sought such an answer and it was never tendered until February 15, 1980, approximately six months after it was due under the rules. This argument—that the Company denied the allegations of the complaint orally—borders on the frivolous.

Nor can I find merit in the Company's argument that substantial evidence on the record as a whole does not support the Board's finding that the Company did not show "good cause" for the failure to timely file an answer. We made it clear in *Livingston* and in *Kessler Institute for Rehabilitation v. NLRB*, 669 F.2d 138 (3d Cir. 1982), that we do not look with favor upon disposition of cases by the Board on the basis of technical or inadvertent noncompliance with procedural rules. As the foregoing chronology of the proceedings demonstrates, however, this was not a case of technical or inadvertent noncompliance.

It is important to remember that the National Labor Relations Board is a vast independent federal agency charged with heavy responsibility in administering the country's labor relations law. It carries an extraordinarily large caseload. Its annual report for the fiscal year ending September 30, 1980, shows that it received in excess of 57,000 cases, 4.5% more than the preceding year. Of these cases, "the public filed 44,-063 charges alleging that business firms or labor organizations, or both, committed un-

fair labor practices, prohibited by the statute, which adversely affected hundreds of thousands of employees."[4] Timely compliance with rules and regulations is necessary in the administration of any system of law, but it is especially important in an administrative agency with the heavy caseload and other responsibilities of the National Labor Relations Board. This does not mean that the rules of the Board are to be used to dispose of cases in a technical or oppressive manner. On the other hand, the Board should not be compelled to tolerate empty excuses for the failure of a party to comply, especially where each day's delay in the disposition of the charges operates to the prejudice of terminated employees.

I cannot agree with the majority that the Board's grant of two extensions of time for filing an answer so as to enable the parties to reach a settlement "unquestionably could be taken as an acknowledgment that an answer would be unnecessary if the case were in fact amicably settled." The regulations are clear that once an unfair labor practice complaint has issued, it may not be withdrawn without the approval of the Regional Director. *See* 29 C.F.R. § 102.9 (1981). Thus, Company counsel could not reasonably have thought that no further communication with the agency was necessary once a private settlement was achieved.

The Board's rules provide and the cases also hold that private settlements do not conclude agency proceedings. Once formal charges of unfair labor practices are filed, the Board acts in a public capacity to give effect to the declared public policy of the Act and once a proceeding is initiated by the filing of unfair labor practice charges, the Board has broad discretion to determine whether it may be abandoned. *See National Licorice Co. v. NLRB*, 309 U.S. 350, 364–365, 60 S.Ct. 569, 577, 84 L.Ed. 799 (1940). In *E. L. Wiegand Division v. NLRB*, 650 F.2d 463 (3d Cir. 1980), *petition for cert. filed*, 50 U.S.L.W. 3402 (U.S. Nov. 2, 1981) (No. 81–841), this court had occasion to consider whether the Board properly denied the employer's motion to dismiss unfair la-

4. Forty-Fifth Annual Report of the National Labor Relations Board 1 (1980).

bor practice charges predicated on a strike settlement agreement in which the Union had agreed to withdraw any and all pending charges related to the strike. In approving the Board's action, we declared:

> By well established principle, private contracts may not be used to legitimate unfair labor practices nor to divest the Board of jurisdiction over such practices. *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1967).

*Id.* at 467.

We do not have a situation here where, as in *Livingston*, an attorney mailed his answer one business day late. Nor is this case like *Kessler* where we differed with the Board's interpretation of its rule as to the last day for filing exceptions once an extension had been granted. There is no evidence here of any non-prejudicial inadvertence or excusable neglect. It is difficult to escape the conclusion that in this case there was a conscious, careful effort to keep the details of the settlement from the Board. There was ample motivation here not to disclose the details of the settlement to the Board. Because the settlement did not propose remedies required to relieve the unfair labor practices charged, both the Company and the Union had ample reason to believe that the settlement was unacceptable to the Board. The letter from the Union attorney to the Board dated October 30 sketching some of the general terms of the settlement revealed that the settlement effectively traded employee rights for other claims unrelated to those rights.[5]

When the two extensions to permit settlement had expired on September 27, 1979, not only was the required answer not filed but there was not even the courtesy of any communication to the Board from Company counsel during the month thereafter. Only when Ms. Greenfield, counsel for the General Counsel, again wrote on October 26 to the Company informing it that unless an answer were filed by October 31, she would seek summary judgment, did the Company write that the settlement agreement had been signed and the complaint would be withdrawn. As it turned out, the agreement had been signed on October 4, 1979. However, no proof of the execution of the agreement was furnished; no details of the settlement were submitted and no copy of the settlement agreement was forthcoming. Furthermore, no effort was made to withdraw the complaint. Despite the Board's considerate and courteous cooperation, Company and Union attorneys failed to supply the General Counsel or the Board with any information; the General Counsel and the Board were completely ignored. Because the agency received no answer or application to withdraw the charges, Ms. Greenfield on January 3, 1980, telephoned the Company and informed it of the continued failure of the Union to request withdrawal of the charges and of her intention to immediately seek summary judgment. Again, no answer was filed and no evidence furnished of the alleged settlement, although five days elapsed before Ms. Greenfield filed the motion.

Only after the January 3 communication did Union counsel write to the Board requesting withdrawal of the charges. Not until after the motion for summary judgment was mailed to the Regional Director on January 8, 1980, did the Union file its request with the Regional Director to withdraw the unfair labor practice charges. The request, in the form of a curt two paragraph letter, referred to a stipulation of settlement but apparently did not enclose a copy of the stipulation; no details were supplied. Only the most skeletal informa-

---

5. The Board noted that the agreement provided that the Company would supply certain sums of monies to pay certain contractual claims unrelated to the alleged unfair labor practice. The Board's position, supported by substantial evidence, is succinctly stated in its brief:

> The agreement's total failure, for example, to provide for backpay for employees alleged to have been discriminatorily discharged, demonstrates the agreement's remedial inadequacy. For the Board to accept an agreement that effectively trades off employee rights to be made whole for a wrongdoer's agreement to execute a settlement of claims unrelated to the unfair labor practices would ... ignore both the rights of the discriminatees and the policies of the Act.

tion was provided. The General Counsel opposed the acceptance of the request because the settlement "did not address or remedy any of the allegations of the complaint, particularly the illegal discharge of more than 50 of the Company's employees." Even after the Board issued its order transferring the proceeding to the Board and directing the Company to show cause because it "had failed and refused to file a timely answer" as required by the Board's rules, the Company again, joined by the Union, requested two extensions of time to respond to the Order to Show Cause, the final date for which was set at February 20, 1980. In keeping with its continued effort not to put anything substantive in writing before the Board and continuing to ignore Board regulations, the Company's attorney as late as February 6, 1980, *telegraphed* the Board simply "deny[ing] all substantive allegations of the complaint and notice to show cause."

On March 27, 1980, the Company attorney withdrew as counsel in these proceedings. New counsel on May 30, 1980—three months after the February 20 deadline—filed a motion for leave to respond to the Order to Show Cause. That motion alleged that no answer was filed because the first Company counsel had relied on representations of Ms. Greenfield that "if the matter was actually settled, and withdrawn, National Book Consolidators, Inc. would be unaffected by the proceedings." The motion was accompanied by an affidavit of the Company's first counsel supporting this allegation.

The Board properly rejected the affidavit. First, the counsel for the General Counsel specifically denied having informed Company counsel that all that was required to conclude the matter was a settlement agreement between the employer and the Union and a request for withdrawal of the complaint, or that the two had ever discussed the terms or effect of any proposed or actual settlement before her declaration that she would move for summary judgment on January 3, 1980. As the Board noted, even assuming that Ms. Greenfield had made the statement, it clearly indicated

that an answer would become unnecessary only if "the matter was actually settled, and withdrawn." As previously noted, the charges could not have been withdrawn under the Board's rules without the approval of at least the Regional Director.

Second, the affidavit asserts that had the affiant as counsel "been aware that the settlement previously agreed to between the charging party and APD [the predecessor company] was subject to approval by the Region, I would have *immediately* filed an Answer on behalf of National Book Consolidators, Inc." Thus, counsel avers under oath that the underlying reason for failure to file an answer was counsel's ignorance of the statute, the rules, the specific instructions in the complaint on filing an answer, and the decisional law. If the ignorance of the law is no excuse for a layman who commits a crime, ignorance of an important principle of labor law on the part of a lawyer practicing in this field is also inexcusable. A lawyer may not complain, as Company counsel does here, that an adversary "never advised [previous Company counsel] that any settlement reached" had to be approved by the Board. If counsel did not know, and he should have, he had ample time to inquire. Had he checked the rules or the decisions, he would have known. If his failure to comply with the terms of the initial two extensions was in reliance on the settlement, a letter to the Board inquiring whether further steps were necessary would have undoubtedly corrected his ignorance of the law.

On the whole the legal profession is comprised of well trained, qualified, and diligent lawyers. They are not expected to have the answers to all legal problems at their fingertips, but they should be able to utilize the available resources to find answers. I recognize also that good lawyers are usually very busy lawyers, but, nonetheless, they should act competently and carefully in representing clients. *See* Model Code of Professional Responsibility, Canon 6 (1979). Although we indicated realistically in *Livingston,* 669 F.2d at 137, that lack of expertise "is not uncommon among general practitioners" in administrative proceedings, this does not absolve them

from the duty to provide reasonably competent representation. It ill behooves a lawyer to depend upon advice and guidance from an opponent in the litigation. Having undertaken representation in a matter beyond his competence, Company counsel should have either declined the employment, or with the consent of his client obtained the association of a lawyer with competence in labor law, or he should have used "proper care to safeguard the interests of his client ... [by] diligently undertak[ing] the work and study necessary to qualify himself." *Id.* at EC 6–4.[6]

Under these circumstances, I must respectfully disagree with the majority's conclusion that the "respondent [Company] continually kept the General Counsel's office informed of the progress of the negotiations" and that the "Respondent was lulled into the belief that a settlement would be acceptable in lieu of answer." On the contrary, the evidence in this record reveals that the Board was cooperative, flexible, and tolerant—not technical or oppressive. I can see no error therefore in the Board's finding that the Company "has failed to offer a sufficient reason to explain its failure to file a timely answer."[7]

### III.

Because I believe the Board committed no error by refusing to accept an answer

tendered months after it should have been filed, I shall only briefly discuss the Company's contention that the Board should have approved the private settlement negotiated by the parties. As previously noted in this dissent, at 330, the Board acts in the public interest and it has broad discretion whether to accept or reject a private settlement of unfair labor practice charges. *See E. L. Wiegand Division v. NLRB, supra; NLRB v. Campbell Soup Co.*, 378 F.2d 259 (9th Cir.), *cert. denied*, 389 U.S. 900, 88 S.Ct. 218, 19 L.Ed.2d 217 (1967). In the case at bar, neither the Regional Director nor the Board was a party to the agreement and neither approved it.[8] The agreement did not address remedies required for the unfair labor practice charged. One must therefore conclude that the Board did not abuse its broad discretion in refusing to approve a private settlement which failed to remedy the unfair labor practices that were charged and pending.

Accordingly, I would deny the petition for review and grant the cross-petition for enforcement.[9]

---

**6.** This ethical consideration continues: "In addition to being qualified to handle a particular matter, his obligation to his client requires him to prepare adequately for and give appropriate attention to his legal work." Model Code of Professional Responsibility EC 6–4 (1979).

**7.** There is no merit to the Company's contention that the Board abused its discretion in refusing to grant the Company's motion to reopen the record or reconsider its decision. The Board's rules, 29 C.F.R. § 102.48(d)(1) (1981), permit reopening of the record for reconsideration of a decision "because of extraordinary circumstances." "Extraordinary circumstances" for the purpose of the statute and this rule, " 'exist only if there has been some occurrence or decision that prevented a matter which should have been presented to the Board from having been presented at the proper time.' " *NLRB v. Allied Products Corp.*, 629 F.2d 1167, 1171 (6th Cir. 1980), quoting from its prior decision in the same case, 548 F.2d 644, 654 (1977). Granting of the motion is discretionary and as the Board

noted, the employer offered nothing that had not already been considered by the Board in its determination that no good cause had been shown to preclude the granting of summary judgment.

**8.** Under the Board's Statement of Procedure settlement agreements after the issuance of a complaint are subject to the approval of the Regional Director, and, depending on the status of the case, to the approval of the Board. 29 C.F.R. § 101.9 (1981).

**9.** In denying the Company's motion to reconsider its decision and void the order directing the reopening of the Maspeth, New York, terminal because compliance with the Board's remedial order was unduly burdensome and perhaps impossible, the Board specifically noted that given the summary judgment nature of the case, such contentions "are more properly raised during the compliance stage of this proceeding."