**HOTEL HOLIDAY INN de ISLA VERDE, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 83–1224.**

United States Court of Appeals, First Circuit.

Argued Oct. 5, 1983.

Decided Dec. 20, 1983.

---

Rafael Buscaglia, Jr., Hato Rey, P.R., for petitioner.

Robert I. Tendrich, Atty., N.L.R.B., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Howard E. Perlstein, Atty., N.L.R.B., Washington, D.C., were on brief, for respondent.

Before BREYER, Circuit Judge, TIMBERS,* Senior Circuit Judge, and SMITH,** Senior District Judge.

RUSSELL E. SMITH, Senior District Judge.

Cross-petitioner, National Labor Relations Board (the Board) seeks to enforce, and petitioner, Hotel Holiday Inn de Isla Verde (the Hotel), seeks to review an order of the Board. The order declared that the Hotel violated Sections 8(a)(1) and (3) of the National Labor Relations Act (29 U.S.C. § 158(a)(1) and (3)) by discharging and refusing to reinstate two employees, Gloria Andrades (Andrades) and Miguel Montalvo (Montalvo), who had been fired during a strike.

This appeal presents three questions: Was there sufficient evidence to support the Board's finding that employee Andrades was illegally fired? Was there sufficient evidence to support the Board's finding that employee Montalvo was illegally fired? And did the Board err in refusing to honor an agreement between the Union and the Hotel settling the strike?

*As to Andrades:*

■ The Hotel fired Andrades by letter which read in part:

> During the past few days you, using a loudspeaker, proffered obscene words towards Mr. David Maza and his family and other employees of the Hotel calling them cuckolds, sluts, and using derogatory language harmful to the integrity of these persons.
>
> Also acting in a threatening way to prevent the guests of the hotel from entering the same, for they feared for their safety upon observing your attitude.

The Administrative Law Judge (ALJ) found that Andrades did use the quoted language over a loudspeaker, and there is no question but that it was heard by some of the employees. The ALJ and the Board found that the language used here as directed to employees did not constitute a cause for discharge. That finding is in accord with the law announced by this court in *Associated Grocers of New England, Inc. v. NLRB,* 562 F.2d 1333 (1st Cir.1977), as follows: "[M]inor picket line and other misconduct, even though crude or offensive, will not justify discipline, as the right to strike necessarily implies some 'leeway for impulsive behavior.'" *Id.* at 1335. In *Associated Grocers* a striking employee made an obscene gesture to and hurled crude epithets at a supervising employee and strike-breaking accomplices.

■ The Hotel contends, however, that Andrades directed epithets and threats at the guests. Where guests are involved, such actions are serious enough to warrant a discharge. In *Montgomery Ward & Co. v. NLRB,* 374 F.2d 606 (10th Cir.1967), the court held that obscene language directed at members of the public did justify a discharge.

■ In this case neither the ALJ nor the Board addressed the factual issue of whether Andrades' epithets or threats were directed at the guests. The only testimony tending to prove that the guests were targets is that of the witness Rivera as follows:

Q Directing your attention to the first week of the strike. Did you hear any kind of words from the people who were on the picket line?

A Yes. Beginning with the first day of the strike, with a loud-speaker using bad language, calling the agents cuckolds—

BY JUDGE DONNELLY:

Q Which agents?

A The security guards, hotel management. The guests that the taxis would drop off in the front. They would threaten them and many of them would leave, many of them remained. And other things. The stones that were hurled. The words. That happened on [sic] the entire week. More or less from the women, the female employees.

* Of the Second Circuit, sitting by designation.

** Of the District of Montana, sitting by designation.

BY MR. RAMOS:

Q  Do you remember the names of some these [sic] women?

A  Yes, I do remember them.

Q  Would you say them?

A  Vilma Maldonado was one. There was someone whose name is more or less Andrades.

Q  Is that Gloria Andrades?

A  It would have to be, yes, it is Gloria Andrades. There was another heavy-set lady whose name is Juana, whose last name I do not. [sic] Diana Rodriguez who worked at the front desk was also there. They would take turns with the microphone.

We think the quoted testimony was sufficient to support a finding that Andrades directed her language and threats at guests and that the Board should have made a finding on the factual issue.

*As to Montalvo:*

■  Montalvo was fired because he was found on hotel property with an ice pick in his possession. Management claims that Montalvo had used the ice pick to puncture tires of automobiles in the parking lot. The evidence supporting management's claim, however, was entirely circumstantial. Montalvo testified as to his innocence, and the ALJ believed him. We cannot say that the evidence was insufficient to sustain the ALJ's and the Board's findings.

*As to the strike settlement agreement:*

The Union and the Hotel reached an economic settlement of the strike on February 22, 1981, and the employees who had not been fired during the strike went back to work on February 23, 1981. Minutes of a meeting conducted by the Union and the Hotel provided that Andrades should report on February 26th and Montalvo on February 28th to sign a stipulation that had been agreed on by the Hotel and the Union. The Hotel was bound to employ all persons who reported on time. At the discretion of the management, an employee who reported late, but no later than February 28th, would be reemployed. The stipulation which Andrades and Montalvo were required to sign contained a promise by the Hotel to withdraw all charges and criminal complaints and required Andrades and Montalvo to release the Hotel from any claims for damages arising out of the strike incidents. Andrades and Montalvo did not appear until after February 28th and were not rehired.

■  We start with the rule that a striker who is unlawfully discharged during the strike is entitled to "unconditional" reinstatement. *NLRB v. International Van Lines,* 409 U.S. 48, 50–51, 93 S.Ct. 74, 76–77, 34 L.Ed.2d 201 (1972). Judged in the afterlight, Montalvo and perhaps Andrades were entitled to unconditional reinstatement. Does the agreement between the Hotel and the Union alter that right? The Union, which was Andrades' and Montalvo's bargaining agent, made a contract for them which provided for a reinstatement conditioned, however, on their reporting at a given time and on their losing pay between the date of firing and the date of their reinstatement (17 days for Andrades and 19 days for Montalvo). The ALJ held that "[a] Union and an employer may not restrict an individual's right to reinstatement by negotiating more stringent terms of reinstatement for them than those available under existing law." The ALJ's holding was affirmed by the Board without comment on this issue. It is to be noted that the agreement was not faulted for any other reason than that given in the quoted language.

It seems to us, however, that neither the ALJ nor the Board considered the fact that at the time the agreement was made neither Andrades nor Montalvo had any established rights to reinstatement. It was known that Andrades had shouted vulgar words over a loudspeaker and that Montalvo was found with an ice pick near a place where tires had been punctured.

The right to unconditional reinstatement was contingent upon the Board's ultimately finding that Andrades and Montalvo were illegally fired. All of the uncertainties of an adversary hearing, *i.e.,* the competence of counsel, the thoroughness of preparation,

the memories of witnesses, the attitudes of the hearing officer, and the availability of witnesses, stood between Andrades and Montalvo and an unconditional reinstatement.

If, as indicated by the ruling in this case, it is the policy of the Board to reject strike settlement agreements in all cases which cannot otherwise be faulted solely because the agreements did not provide all that the employees might have ultimately gotten by litigation, then the Board has removed any incentive on the part of the employer to bargain on reinstatement issues.

In *J.I. Case Co. v. NLRB,* 321 U.S. 332, 64 S.Ct. 576, 88 L.Ed. 762 (1944), the Supreme Court said:

> "The Board asserts a public right vested in it as a public body, charged in the public interest with the duty of preventing unfair labor practices." *National Licorice Co. v. Labor Board,* 309 U.S. 350, 364 [60 S.Ct. 569, 577, 84 L.Ed. 799]. Wherever private contracts conflict with its functions, they obviously must yield or .the Act would be reduced to a futility.

*Id.* at 337, 64 S.Ct. at 580. We think it was the duty of the Board here to determine whether under the circumstances this contract conflicted with the duty of the Board to prevent unfair labor practices. We do, however, think that, if the Board is to reject all settlements because they do not award as much as the employee is determined to be entitled to after litigation, it should announce the reasons for such a rule after giving consideration to the fact that in most disputes, and certainly in this one, all is not black and white.

■ *The case is remanded to the Board* with the following directions: to reexamine the ruling of the ALJ on the settlement issue in light of the facts existing at the time of the contract; to consider why a fair settlement of disputed claims, so highly regarded in all other areas,[1] is inappropriate in labor cases; and to express just how a settlement such as this one interferes with the Board's function of preventing unfair labor practices.

If the Board decides the contract did interfere with its function, it shall make findings as to the effect of Andrades' language on the guests of the Hotel, and it shall determine whether the conduct found was sufficient to warrant a discharge.

'The Board shall then make such ruling as it deems appropriate.

BREYER, Circuit Judge,. dissenting.

I disagree with my brethren because I would interpret the agency's decision somewhat more generously, and, as so interpreted, it complies with the law. The law in respect to settlement agreements is fairly clear. The Board has the *power* to set aside an unfair labor practice settlement and impose its own remedy. Indeed, section 10(a) of the N.L.R.A., 29 U.S.C. § 160(a), specifically states that the Board's power to prevent unfair labor practices "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law or otherwise." *See, e.g., NLRB v. South Central Bell Telephone Co.,* 688 F.2d 345, 352–54 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1768, 76 L.Ed.2d 342 (1983); *E.L. Wiegand Division v. NLRB,* 650 F.2d 463, 467 (3rd Cir.1981) (citing *International Union of Electrical, Radio and Machine Workers v. NLRB,* 328 F.2d 723, 727 (3rd Cir. 1964)), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982); *Lodge 743, International Association of Machinists v. United Aircraft Corp.,* 337 F.2d 5, 8 (2d Cir.1964), *cert. denied,* 380 U.S. 908, 85 S.Ct. 893, 13 L.Ed.2d 797 (1965); *NLRB v. Walt Disney Productions,* 146 F.2d 44, 48 (9th Cir.1944), *cert. denied,* 324 U.S. 877, 65 S.Ct. 1025, 89 L.Ed. 1429 (1945). Moreover, the

---

1. *Pearson v. Ecological Science Corp.,* 522 F.2d 171 (5th Cir.1975), states the principle that " '[s]ettlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits'. *D.H. Overmyer Co. v. Loflin,* 5 Cir.1971, 440 F.2d 1213, 1215; *W.J. Perryman & Co. v. Penn Mutual Fire Insurance Co.,* 5 Cir.1963, 324 F.2d 791, 793." *Id.* at 176. *See also* Justice Powell's dissent in *United Airlines, Inc. v. McDonald,* 432 U.S. 385, 401, 97 S.Ct. 2464, 2473, 53 L.Ed.2d 423 (1977).

Board typically follows my brethren's advice about how to exercise that power: it *explains why,* in the particular case, the settlement is inadequate. *See, e.g., APD Transport Corp.,* 253 N.L.R.B. 468 (1980), *enforcement denied on other grounds,* 672 F.2d 323 (3rd Cir.1982); *Clear Haven Nursing Home,* 236 N.L.R.B. 853 (1978); *Finishline Industries, Inc.,* 181 N.L.R.B. 756, 758–59 (1970), *modified in other respects,* 451 F.2d 1280 (9th Cir.1971); *Wix Corp.,* 140 N.L.R.B. 924, 943 (1963), *enforcement denied on other grounds,* 336 F.2d 824 (4th Cir.1964). *But see, e.g., E.L. Wiegand Division,* 246 N.L.R.B. 1143, 1149 (1979) (no specific explanation offered), *enf'd,* 650 F.2d 463 (3rd Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982); *Wooster Division of Borg-Warner Corp.,* 121 N.L.R.B. 1492, 1494–95 (1958) (same).

The difficulty in this case arises out of the Board's failure to give any such explanation and the ALJ's flat statement that a "Union and an employer may not restrict an individual's right to reinstatement by negotiating more stringent terms of reinstatement for them than those available under existing law." Were this statement an accurate account of Board policy, I should agree that the Board should at least have to explain why it has adopted so restrictive a rule. But the ALJ's statement does not seem to state Board policy accurately. Rather, the Board seems to decide the issue of "settlement supplantation" case by case. *See, e.g., United Aircraft Corp.,* 192 N.L.R.B. 382 (1971), *enf'd in part on other grounds,* 534 F.2d 422, 451 (2d Cir. 1975), *cert. denied,* 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976); *Finishline Industries, supra; Ideal Donut Shop,* 148 N.L.R.B. 236 (1964), *enf'd,* 347 F.2d 498 (7th Cir.1965); *cf. Spielberg Manufacturing Co.,* 112 N.L.R.B. 1080 (1955) (identifying factors Board will consider in deciding whether to defer to arbitration of unfair labor practice charges). Thus, the issue here is whether the Board must explain in this case, particularly in light of the ALJ's overstatement, why it has chosen to set aside the settlement.

I would not remand for such an explanation here for the following, somewhat special, reasons. First, the Board's past cases come close to governing this one. The Board disfavors settlements that do not involve posting notices of unfair labor practices in order to dissipate the adverse effect of the practices among *other* employees. *See APD Transport Corp., supra; Clear Haven Nursing Home, supra; cf. Jeffco Manufacturing Co.,* 211 N.L.R.B. 787 (1974), *enforcement denied on other grounds,* 512 F.2d 1248 (4th Cir.1975). And, the Board does not *invariably* spell out its reasons for overturning a settlement, particularly when the settlement at issue is of a sort covered by previous cases. *See, e.g., E.L. Wiegand Division, supra; Erie Resistor Corp.,* 132 N.L.R.B. 621, 631 n. 31 (1961), *enforcement denied on other grounds,* 303 F.2d 359 (3rd Cir.1962), *rev'd,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963), and *enf'd on remand sub nom. International Union of Electrical, Radio and Machine Workers v. NLRB, supra; Wooster Division, supra.* Thus, there is little chance that, on remand, the Board will reach a different result. This likelihood is made smaller by the evidence in the record that suggests the Union/employer "settlement" *explicitly* left open the possibility that an employee could reject it and follow his "unfair labor practice" remedy on his own (a matter not discussed by the ALJ).

Second, the parties did not focus the Board's attention here on the need to explain just why this settlement should not be followed. The employer did not argue that the agreement was a reasonable way to settle an unfair labor practice charge. Rather, it rested its argument on the claim that there was no unfair labor practice—that the employees' conduct justified the discipline provided. A plausible reading of its briefs, both before the Board and before us, suggests that it thereby came close to conceding that, if the employees' conduct was protected, the settlement was inadequate. *See* Brief for Petitioner at 22, 28–29; Appendix at 23–24. It is, therefore, not surprising that the Board, having found the strikers' conduct protected, did not go on to explain why it set aside the agreement.

ALJ's and Labor Board members are not computers, automatically recognizing every

possible legal implication of each fact in a case and plugging in the correct set of cases and precedents without fail. Ordinarily they must rely upon the parties to focus the arguments—and to state their objections clearly. Had the parties here clearly pointed the Board down the right legal track, I should agree that remand was proper. But where the facts, as here, resemble those in other cases in which the Board, providing appropriate reasons, set aside settlements *and* the employer's arguments did not directly require an answer that would have explained why the settlement was to be set aside in this instance, I would not remand for further explanation. I would find a "waiver" of any requirement of greater precision. But beneath that finding rests my assumption, grounded in past cases, that the Board simply believed that here the union/employer agreement (if it was meant to bind the employees) was too stringent because (1) it deprived them of some back pay, *see, e.g., Finishline Industries, supra; Ideal Donut Shop, supra,* (2) it did not provide for notice to other employees, *see, e.g., APD Transport Corp., supra; Clear Haven Nursing Home, supra,* and (3) the employees had no hand in negotiating it, *see, e.g., APD Transport Corp., supra; cf. Spielberg Manufacturing Corp., supra* (limits on deference to arbitration); *Wertheimer Stores Corp.,* 107 N.L.R.B. 1434 (1954) (same). The Board, in my view, has adequate power to set aside the agreement for these reasons.

Nor do I believe the Andrades' finding affords a sufficient basis for remand. As the majority points out, the issue is whether she threatened guests or singled them out for abuse, or rather simply used foul language over the loudspeaker. The company, in its letter discharging Andrades accused her, among other things, of "acting in a threatening way to prevent the guests of the hotel from entering." But the witness' testimony, quoted by the majority here as the only evidence of conduct directed at guests, is ambiguous as to whether Andrades used foul language, threatened guests, or both. On the next page of the transcript, the ALJ asks the witness to focus directly on what Andrades said; the witness describes foul remarks aimed at

management, but he says nothing about guests. It seems to me that the ALJ could conclude from this testimony (along with the fact that the employer could have sought to pin the witness down further, but failed to do so, *see Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 174, 94 S.Ct. 414, 420, 38 L.Ed.2d 388 (1973); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 226, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939)) that Andrades used bad language concerning hotel staff but that the evidence was inadequate to show that she threatened or harassed guests or "hurled" "stones." And, the ALJ could reasonably have concluded that the use of epithets against management was not sufficient to place Andrades outside the Labor Act's protection.

As to both issues, the Board might have done better to have provided more detailed explanation. But given the lack of focus of the parties' arguments, I do not believe it was legally required to do so.