645 F.2d 177
 107 L.R.R.M. (BNA) 2139, 91 Lab.Cas. P 12,705
 NORTH CAMBRIA FUEL COMPANY, INC., Petitioner in No. 80-1381
and Hans P. Wuchina, Paul G. Baughman, Louis T. Zilli,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Paul Baughman, Louis Zilli, Wayne Campbell, Ronald Smith,
Roger Snyder, Norman Gorman, and Dale Basinger,
Intervenors.
Paul BAUGHMAN, Louis Zilli, Wayne Campbell, Ronald Smith,
Roger Snyder, Norman Gorman, and Dale Basinger,
Petitioners in No. 80-1568,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
North Cambria Fuel Company, Inc., Intervenor.
 Nos. 80-1381, 80-1568.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 12, 1981.
Decided April 10, 1981.
 
 Joseph N. Mack (argued), John A. Bonya, Mack & Bonya, Indiana, Pa., for petitioner in No. 80-1381, intervenor in No. 80-1568.
 Melvin P. Stein (argued), Kuhn, Engle & Stein, Pittsburgh, Pa., for petitioners in No. 80-1568, intervenors in No. 80-1381.
 William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Ann Jones Diamond (argued), Atty., N.L.R.B., Washington, D. C., for respondent.
 Before SEITZ, Chief Judge, ROSENN and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Chief Judge.
 
 
 1
 North Cambria Fuel Company (NCF) petitions for review of an order of the National Labor Relations Board (the Board) finding NCF guilty of violating section 8(a)(3) and (1) of the National Labor Relations Act by wrongfully discharging Hans Wuchina, a striking employee. Seven former NCF employees (the Baughman group) petition for review of that portion of the Board's order finding that they were lawfully discharged by NCF because they had engaged in serious strike misconduct. The Board cross-petitions for enforcement of its order.
 
 I.
 
 2
 NCF and United Mine Workers of America Local 1880 (the Union) were parties to the National Bituminous Coal Wage Agreement of 1974. When that agreement expired on December 6, 1977, the Union engaged in an economic strike against NCF. The Union returned to work on March 26, 1978, when a new national agreement was reached with the Bituminous Coal Operators Association. NCF, which is not a member of the Association, refused to accept this agreement and continued negotiating with the Union. When an agreement could not be reached, the Union resumed its economic strike.
 
 
 3
 The strike was marred by violence and vandalism, and NCF obtained two state-court injunctions prohibiting the Union from maintaining more than four pickets at any NCF worksite and enjoining any Union interference with the company's operations. On July 10, 1978, the day after a heated union meeting in which the Union's members were told to put on a "show of force," a group of union members, including Wuchina and the Baughman group, gathered near the entrance to NCF's I-22 coal-loading facility. When six coal trucks approached the facility the union members assembled at the entrance in an attempt to prevent the trucks from entering. The strikers shouted obscenities at the drivers, made obscene gestures, and picked up rocks.
 
 
 4
 Soon after the strikers blocked the entrance to the I-22 facility, the county sheriff arrived and ordered the strikers to disperse because they were violating a state-court injunction. The strikers moved across the highway and stayed there until after the sheriff left with four of the coal trucks. When the remaining two trucks attempted to leave, the lead truck was attacked by a group of strikers throwing rocks. Some of the rocks hit the truck, breaking its windshield but not causing any injuries.
 
 
 5
 Following the incident at the I-22 facility, NCF filed contempt charges in state court. The court found the strikers, including Wuchina and the Baughman group, in contempt of court and ordered four strikers not involved in these appeals to pay for the damages to the truck. NCF also brought criminal charges against the strikers, charging them with riot, criminal trespass, and the propulsion of missiles into an occupied vehicle. The Baughman group entered guilty pleas to the reduced charge of disorderly conduct, and their fines were paid by the Union. Following entry of the pleas, NCF's attorney indicated that the guilty pleas could result in discharge because they were admissions of guilt with regard to the violence at I-22. The company subsequently discharged the Baughman-group employees because of their "criminal activity" at the coal-loading facility. Wuchina pleaded not guilty at his preliminary hearing and was bound over for trial. The day after his hearing Wuchina also was discharged by NCF because of his involvement in the incident at I-22. The charges against Wuchina were later dismissed for failure of the state to prosecute.
 
 
 6
 The discharged employees filed complaints against NCF with the Board. After a hearing, the administrative law judge (ALJ) concluded that NCF had violated section 8(a)(3) and (1) of the National Labor Relations Act by discharging the employees because they had been engaged in protected strike activity. The Board agreed that Wuchina's discharge was wrongful, but it overturned the ALJ's finding that the Baughman group had not engaged in serious strike misconduct. The Board found that Wuchina left the I-22 facility when the sheriff ordered the strikers to disperse, but it concluded that the Baughman group had remained and was present during the rock-throwing incident.
 
 II.
 A. NCF Petition
 
 7
 NCF first argues that the record does not support the Board's finding that Wuchina left the I-22 facility after the sheriff ordered the strikers to disperse. We must, of course, uphold the Board's finding if it is "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e) & (f) (1976); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). NCF directs our attention to evidence indicating that Wuchina not only remained at the I-22 facility but also participated in the rock-throwing incident. Nevertheless, we find that the Board's finding is supported by substantial evidence on the record. For example, Wuchina's testimony that he left the loading facility when the sheriff arrived was corroborated by the testimony of two other strikers, and a third union member testified that he saw Wuchina at a local ice cream stand fifteen minutes after Wuchina testified that he left I-22 and twenty minutes before the other strikers began to arrive. In addition, Wuchina was the only striker who pleaded not guilty to the criminal charges, and NCF allowed Wuchina to return to work after he signed a statement that he had not been involved in the violence at the coal-loading facility. Although the evidence presented at the hearing was conflicting, our review of the record indicates that the evidence supporting the Board's finding is not "overborne by evidence calling for contrary inferences." NLRB v. Pittsburgh Steamship Co., 340 U.S. 498, 502, 71 S.Ct. 453, 455, 95 L.Ed. 479 (1951).
 
 
 8
 Moreover, the ALJ made specific credibility determinations to support her finding that Wuchina left the I-22 facility before the rock-throwing incident. The ALJ emphasized that Wuchina's testimony was persuasive because he had been more candid about the events of July 9 and 10 than the other union witnesses and had made various admissions concerning those events. These findings were adopted by the Board. NCF asks this court to overturn these credibility determinations because they are "based on an inadequate reason, or no reason at all." NLRB v. Moore Business Forms, Inc., 574 F.2d 835, 843 (5th Cir. 1978). This court, however, will not disturb the credibility findings of an ALJ as long as the ALJ considers all relevant factors and sufficiently explains his or her resolutions. See NLRB v. W. C. McQuaide, Inc., 552 F.2d 519, 526 n. 14 (3d Cir. 1977). In this case, the ALJ fully explained her credibility findings, and these explanations show that she considered various factors relevant to credibility, such as demeanor, admissions, and self-interest.
 
 
 9
 NCF contends that even if Wuchina was not present at the I-22 facility during the rock-throwing incident, his actions before the sheriff's arrival constituted serious strike misconduct justifying termination of his employment. NCF disputes the ALJ's finding that Wuchina's only misconduct was crossing the road with the other strikers and congregating at the entrance to the loading facility in violation of the state-court injunction. Wuchina's testimony that he did not threaten or harass the truck drivers is "not believable" according to NCF. The ALJ, however, apparently credited Wuchina's testimony in this regard, and we hold that substantial record evidence supports this finding.
 
 
 10
 NCF argues, however, that even if Wuchina did not use obscenities or attempt to provoke or threaten the truck drivers, his discharge was lawful because he aided and abetted fellow strikers who engaged in such strike misconduct. Union members who actively cooperate with strikers engaged in serious misconduct are equally culpable. See, e. g., W. J. Ruscoe Co. v. NLRB, 406 F.2d 725 (6th Cir. 1969); Oneita Knitting Mills, Inc. v. NLRB, 375 F.2d 385 (4th Cir. 1967); cf. NLRB v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 373 (1939) (union members who delivered food and supplies to sitdown strikers occupying plant were aiders and abettors). However, even assuming that Wuchina's participation in the blocking of the facility's entrance is sufficient to show that he actively cooperated with the strikers who provoked and harassed the truck drivers before the sheriff's arrival, his discharge was not lawful unless the actions of those strikers amounted to serious strike misconduct. The ALJ found that these strikers shouted obscenities, used obscene gestures, picked up rocks, and attempted to provoke the truck drivers. NCF maintains that the caselaw demonstrates that these actions constitute serious misconduct because strikers have no right to intimidate nonstriking employees or to interfere with the employer's operations. The Board and the intervenors distinguish the cases relied on by NCF, arguing that they involved "substantially more egregious conduct" than that which occurred prior to the sheriff's arrival.
 
 
 11
 In Republic Steel Corp. v. NLRB, 107 F.2d 472 (3d Cir. 1939), modified on other grounds, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940), this court stated that Congress must have contemplated that the protection of the National Labor Relations Act would extend to employees who commit minor acts of misconduct while exercising their right to strike. This court subsequently has found that the following do not constitute serious strike misconduct: a minor scuffle amounting at most to disorderly conduct, see NLRB v. Buitoni Food Corp., 298 F.2d 169 (3d Cir. 1962); abusive, vulgar, and profane language, see McQuaide, 552 F.2d 519; and ambiguous threats, see id. The actions of the strikers before the sheriff's arrival fit within these cases. There was neither any violence nor any damages or injuries. Although the strikers used obscenities and attempted to provoke the truck drivers, these actions are not serious strike misconduct. In addition, interference with the employer's operations was slight and lasted only for a short time, and the strikers stopped blocking the entrance to the facility as soon as the sheriff arrived. The Board is entitled to deference in drawing the line between strike misconduct and protected activity. Therefore, we uphold the Board's conclusion that the actions of the strikers before the sheriff's arrival did not constitute serious strike misconduct.
 
 
 12
 Finally, NCF argues that the Board abused its discretion by ordering it to pay twelve percent interest on back wages owed to Wuchina. NCF contends that this interest rate is improper because it bears no relation to the loss sustained by an employee who has not had the use of his money, does not reflect the cost of money to the average consumer, and exceeds the six percent legal rate of interest in Pennsylvania, which more closely approximates the interest rate paid on bank savings accounts. The Board, however, has broad discretion in fashioning remedies, and this discretion extends to the imposition of an interest rate. See Local 777, Democratic Union Organizing Committee, Seafarers International Union v. NLRB, 603 F.2d 862, 891 n. 84 (D.C.Cir.1978). The interest rate imposed by the Board reflects an employer's cost of borrowing. Therefore, it is rationally related to the Board's objective of discouraging employers from "borrowing" from employees instead of paying backpay awards promptly. Furthermore, the legal rate of interest in Pennsylvania has no bearing on what interest rate is appropriate to effectuate the goals of federal labor legislation. Thus, we hold that the Board did not abuse its discretion by imposing a twelve percent interest rate on the backpay award.B. Baughman Group Petition
 
 
 13
 The seven employees in the Baughman group challenge the Board's finding that they engaged in serious strike misconduct justifying termination of their employment. They contend that their actions at the I-22 facility did not constitute serious strike misconduct as a matter of law. The Board's factual findings with respect to the Baughman group, which are not contested, are as follows: They went to the I-22 facility in response to the Union's call for a "show of force;" they participated in the initial blocking of the facility with approximately twenty other union members; one of them admitted picking up a rock and testified that "everybody else picked up a rock;" some of them shouted obscenities at the truck drivers; they did not leave I-22 after the sheriff ordered the strikers to disperse; they were in the group of fifteen strikers who remained across the road from the facility's entrance and attacked the coal truck with rocks after the sheriff left; they were held in contempt of the state-court injunction; and they pleaded guilty to disorderly conduct charges.
 
 
 14
 Unlike the activities at the I-22 facility before the sheriff's arrival, the rock-throwing attack rises to the level of serious strike misconduct. The strikers present engaged in violence that created a substantial risk of bodily injury and caused property damage. In addition, these strikers pleaded guilty to criminal charges stemming from this incident. We find that the actions of the strikers who remained after the sheriff's arrival would "reasonably tend to coerce or intimidate employees in the exercise of rights protected under the Act." McQuaide, 552 F.2d at 528.
 
 
 15
 The Baughman-group employees appear to rest their argument on the fact that the Board did not establish that they, as opposed to the other strikers, actually threw the rocks. However, as noted earlier, union members who actively cooperate with strikers engaged in serious strike misconduct are equally culpable. Active cooperation has been shown here. The Baughman group constituted one-half of the strikers remaining after the sheriff ordered the union members to disperse, and they crossed the road with the other strikers as the remaining coal trucks attempted to leave. The Board found that at least twenty rocks thrown by this group of fifteen strikers hit the truck in a very short time. Moreover, the guilty pleas to the criminal charges also support a finding that the Baughman group participated in and supported the strike misconduct. Therefore, the Board did not err in concluding that the employees in the Baughman group had engaged in serious strike misconduct.
 
 
 16
 The Baughman group also contends that the Board erred in placing upon the General Counsel the burden of establishing that the strikers had not engaged in serious misconduct. In placing this burden upon the General Counsel, the Board cited its decision in Ohio Power Co., 215 NLRB No. 133 (1975). Ohio Power provides that if the employer shows that it reasonably held an honest belief that an employee engaged in serious strike misconduct, the General Counsel must show that such misconduct did not occur. The Baughman group argues that this procedural rule is improper because it "deprives employees of statutory rights without an affirmative showing of wrongdoing." The Baughman group apparently contends also that this rule in effect establishes a good faith defense for an employer and requires the General Counsel to rebut the employer's good faith.
 
 
 17
 The Board, however, did not require the General Counsel to rebut NCF's good faith belief, but only to bear the burden of proving that the strikers had not engaged in serious misconduct. It is settled that the burden of proving a violation of the National Labor Relations Act is on the General Counsel. See, e. g., Arthur L. Morgan Union, Local 3 v. NLRB, 463 F.2d 818, 819 n. 3 (D.C.Cir.1972); NLRB v. St. Louis Cordage Mills, 424 F.2d 976, 979 (8th Cir. 1970); cf. 29 U.S.C. § 160(c) (1976) (Board must dismiss complaint unless it finds upon preponderance of evidence unfair labor practice has been committed). Because the General Counsel must establish the essential elements of an unfair labor practice, it is not incorrect to require that the General Counsel prove that employees have not engaged in serious strike misconduct justifying their discharge. As a result, the procedural rule imposed by the Board in this case does not conflict with the provisions of the National Labor Relations Act or improperly deprive employees of protected rights. See Dallas General Drivers, Local 745 v. NLRB, 389 F.2d 553 (D.C.Cir.1968); NLRB v. Plastic Applicators, Inc., 369 F.2d 495 (5th Cir. 1966).
 
 III.
 
 18
 The petitions for review of the order of the Board will be denied. The Board's cross-petition for enforcement of its order will be granted.