**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**A. DUIE PYLE, INC., Respondent.**

**No. 83-3139.**

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1984.

Decided March 22, 1984.

---

120

Timothy P. O'Reilly (argued), Michael L. Banks, Morgan, Lewis & Bockius, Philadelphia, Pa., for respondent.

Helen Morgan (argued), Ralph C. Simpson, N.L.R.B., Washington, D.C., for petitioner.

Before HUNTER and WEIS, Circuit Judges, and DUMBAULD, District Judge.[*]

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this enforcement proceeding, the National Labor Relations Board contends that an employee should be reinstated even though he made arson threats during a strike. Because the Board used a standard we had previously rejected, we will not enforce that reinstatement decision. In another instance, the Board concluded that the use of a knife during a picket line scuffle would have been justified as self defense. Because this premise conflicts with state criminal law under the facts here, we will not enforce the Board's order of reinstatement.

An ALJ found that the employer had discharged James Scott in violation of section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), but that there had been adequate grounds for the discharge of Robert J. Touchton. The Board affirmed as to Scott, but reversed as to Touchton, directing that both employees be reinstated. One member of the panel dissented, finding adequate justification for the dismissals of Scott and Touchton. The Board petitions for enforcement.

The respondent A. Duie Pyle, Inc. is in the business of transporting freight and warehousing. The company has its main warehouse and terminal facilities in West Chester, Pennsylvania and also maintains a large warehouse about 20 miles away in Parkesburg, Pennsylvania. Teamsters Local 312 represented three units of employees at the West Chester plant; the employees at Parkesburg were not unionized.

Events giving rise to this case occurred during an economic strike by Local 312 at the West Chester premises. The strike began on May 21, 1979 with picketing at West Chester and Parkesburg, although the Parkesburg employees were not on strike. On August 20, 1979, most of the West Chester employees returned to work. Later that year, the Teamsters Local was decertified as the bargaining agent for the West Chester units.

The strike was not dispassionate. The ALJ found that the record "shows a background of violence wherein union agents and striking employees appear to have attacked and destroyed Respondent's property including breaking truck windows, assaulting drivers of customer's trucks, and threatening customers crossing the picket line."

On May 25, 1979, the Court of Common Pleas of Chester County, Pennsylvania issued a preliminary injunction restraining the union from interfering with business at both facilities by threats and acts of intimidation, coercion, and violence. The union consented to the entry of this decree as well as an extension into late August. On June 8, the union and several of its members, including Touchton and Scott, were found in contempt of the injunction order.

The events leading to Touchton's discharge occurred on the night of May 31, 1979 at the nonstruck Parkesburg facility. Edward Givler, a warehouseman and truck driver, accompanied a plant guard who was investigating an unusual noise that seemed to come from the picket line located at the intersection of the state highway and the road leading to the company's warehouse. It was dark and the guard brought his dog along.

Givler stayed back about 300 feet from the intersection as the guard walked down the road. Both heard Touchton yell to inquire if the guard had brought his dog. The striker also threatened the guard, stating he would shoot the animal. As the guard walked back towards Givler, Touchton yelled: "Givler, your house is on fire."

[*] The Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

The guard heard him add: "if it is not now, it will be Saturday." Touchton repeated the first arson threat twice more within a ten minute span, and, as before, it was heard by Givler and the guard.

Givler owned a historic house built in 1736. He had renovated it at considerable expense and Touchton knew of Givler's exceptional pride in the house and the efforts given to its preservation. After Touchton's threat, Givler began to keep a loaded shotgun at his house, and asked the police and his father to keep a watch on the premises.

On the night of the Touchton incident, Givler reported it to James Latta, Jr., the president of the company. Latta was particularly sensitive to the threat because his house had been subjected to arson by a nonemployee one year before. The company wrote to Touchton on June 1, advising him that the May 31 incident would be investigated and that disciplinary measures might follow.

The company presented the arson threat to the Court of Common Pleas at a hearing on June 8 as one of several grounds for a contempt of court citation. Without admitting that any union member committed a criminal act, the union attorney consented to a finding of contempt. On June 11, 1979, the company discharged Touchton. He did not testify at the NLRB hearing that followed.

The ALJ found that Touchton made the arson threat because of its special meaning to Givler. Applying the Board's "physical acts or gestures" standard for discharge, the ALJ concluded that Touchton's conduct was the "coercive equivalent" of such acts and thus justified his discharge. The ALJ found it unnecessary to consider Givler's specific reaction to Touchton's words or Latta's particular sensitivity to arson threats. The General Counsel's assertion that the discharge was improperly based on the contempt citation was rejected. The Board majority disagreed with the ALJ's conclusion because Touchton's threats were not accompanied by "physical acts or gestures" and were not "sufficiently egregious" to deny reinstatement.

The facts surrounding the Scott discharge are more extensive. The company presented evidence implicating Scott in several incidents that arguably justified his discharge. The ALJ concluded, however, that Scott's discharge was based solely on his altercation with company supervisor Anthony Talamonti. Talamonti's and Scott's version of this incident varied substantially.

Late in the afternoon of May 31, after spending several hours at a nearby tavern, Scott parked his camper in a parking lot across the street from the company's West Chester facility. This vehicle consisted of a cabin, with a door at the rear, mounted on the bed of a pickup truck. The cabin was occupied by Scott, two other union members, and a female friend.

The ALJ found that as Talamonti walked by the camper, Scott uttered threats that Talamonti "reasonably construed as being directed against his home and family." He continued to the company office a block away, but after pondering the remarks, angrily returned "seeking to physically confront Scott."

The ALJ further found that as Talamonti approached the camper, he met Larry O'Connor, a union official, and said in reference to Scott that he "wanted that fuzzy faced [expletive]. I'm going to kill him." Scott then opened the rear door of the camper and taunted Talamonti with "what do you want, [expletive]." A scuffle between Talamonti and Scott then took place.

The witnesses disagreed as to whether Scott had a sheath knife in his right hand when he opened the camper door. Two of his fellow-picketers, Wilson and Davie, said they did not see a knife in Scott's hand. Testimony by another striker, Spence, was unclear.

On the other hand, James Latta, III, the terminal manager, and Ralph Oestreich, a supervisor-dispatcher, said they saw Scott lunge at Talamonti with a knife. In addition, one of the strikers, Michael Ranieri, testified that he saw Scott with knife in hand lunging at Talamonti who was mov-

ing backwards. The witnesses generally agreed that after the combatants separated briefly, Talamonti pulled a knife from his pocket and opened it. At that point the bystanders intervened and stopped the altercation.

Talamonti also testified that Scott's first lunge with the knife cut Talamonti's left hand which was grabbing at Scott's right hand. Talamonti described the cut as minor and said it was bandaged afterwards by a secretary at the company office.

At the June 8 hearing in Common Pleas Court, Scott's lunging at Talamonti with a knife was cited as an act in contempt of the court's injunction. As in Touchton's case, the union's attorney, who represented Scott and the other individual defendants, agreed to a finding of contempt but without admitting any violation of the criminal law. Scott was present in court at the time.

The ALJ took the position that whether Scott attacked with a knife was immaterial because such action was reasonable as a matter of self-defense. According to the ALJ, Scott's behavior was justified even though "(1) he did not await Talamonti and defend himself ... inside the camper, or (2) attempt to avoid a confrontation by locking the back door (assuming this could be done)."

As the ALJ saw it, "[t]hat Scott, with too many beers, may have acted with excess force or unwisely is not the issue.... Scott verbally provoked Talamonti, but ... Talamonti had no legal right after 15 minutes of hiatus to physically assault Scott." Rather, Talamonti should have "followed other courses of action including engaging the police and discharging Scott."

The ALJ concluded that but for "the knife fight" Scott would not have been discharged. "[E]ven if Scott had used a knife, Respondent had no honest belief that Scott had engaged in such physical misconduct as to disqualify him ... and in any event, General Counsel successfully shouldered the burden of proving that Scott did not in fact, engage in disqualifying misconduct."

The ALJ noted the failure of General Counsel to produce O'Connor, the union official who was standing within a few feet of the combatants. His testimony was considered unimportant by the ALJ because even if O'Connor saw Scott with a knife, that fact was immaterial in the ALJ's view of the case. The ALJ's opinion did not mention that the General Counsel failed to call Laloup, a fellow-striker who Scott said was in the camper with him, or that the company did not call the employee who allegedly bandaged Talamonti's hand. The ALJ did not discuss or make any findings on the employer's allegations of picket line misconduct by Scott on other occasions.

The majority of the Board agreed with the ALJ's finding that Scott was improperly discharged. In so doing, the majority referred to, what it termed, the "Respondent's version" of the facts as a series of events that, in the Board's words, "end[ed] up with a supposed knife attack." Later in its memorandum, the majority said that the ALJ "discredited Respondent's version of the knife fight, and specifically found that Talamonti was in fact the aggressor." The dissent concluded that Scott's threats alone, as well as those by Touchton, were sufficient to deny both employees reinstatement.

The employer contests the Board's petition for enforcement, contending that the Board erred in failing to defer to the state court finding of contempt, in applying an incorrect standard of law on the justification for using a deadly weapon, and in refusing to defer to a settlement agreement between the company and Touchton.

## I.

We can quickly resolve the contention that the Board should have deferred to the settlement agreement between the company and Touchton. Before the hearing began, Touchton's attorney informed the ALJ that a satisfactory settlement agreement had been reached with the company. The General Counsel objected on the bases that the monetary amount was not adequate

and that the agreement did not provide for the posting of notices at the work place.

 Despite Touchton's satisfaction with the proposed settlement, the ALJ refused to approve it. We may not consider whether the ALJ erred in this instance because the company failed to raise the settlement issue before the Board. *See, e.g., NLRB v. Cardox Division of Chemetron, Corp.*, 699 F.2d 148, 152 n. 10 (3d Cir.1983) (*citing Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665, 102 S.Ct. 2071, 2082, 72 L.Ed.2d 398 (1982)); *United Dairy Farmers Cooperative Ass'n v. NLRB*, 633 F.2d 1054, 1064 (3d Cir.1980).

We cannot refrain from commenting, however, on the Board's reluctance to defer to settlements in cases such as this where the charging party has no desire to proceed. It is true that in arbitration deferral cases, we have recognized that the Board should "not abdicate its responsibility to protect statutory rights." *NLRB v. Al Bryant, Inc.*, 711 F.2d 543, 550 (3d Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984); *see also, Ciba-Geigy Pharmaceuticals Division v. NLRB*, 722 F.2d 1120, 1125–26 (3d Cir. 1983). This public interest consideration has guided other courts in reviewing Board decisions on deferring to settlements. *See Hotel Holiday Inn de Isla Verde v. NLRB*, 723 F.2d 169, 173 (1st Cir.1983) (strike settlement); *Airport Parking Management v. NLRB*, 720 F.2d 610, 615–16 (9th Cir. 1983) (strike settlement); *Roadway Express, Inc. v. NLRB*, 647 F.2d 415, 421–24 (4th Cir.1981). *See also, Schaefer v. NLRB*, 697 F.2d 558, 562 (3d Cir.1983).

However, these decisions also place importance on the highly favored status the law gives to private, amicable resolution of labor disputes. *Hotel Holiday Inn*, 723 F.2d at 173 & n. 1; *Airport Parking*, 720 F.2d at 614–15; *Roadway Express*, 647 F.2d at 426. *See also NLRB v. Pincus Brothers, Inc.—Maxwell*, 620 F.2d 367, 372–74 (3d Cir.1980).[1] Also at issue is the proper use of limited resources—ours, as well as the Board's.

The Board has a substantial backlog of cases awaiting disposition. Here, for example, more than two years elapsed before the Board ruled on the ALJ's decision. Six more months passed before the petition for review was filed in this court. In the face of such delays, it is difficult to justify the time expended in the administrative and judicial process to adjudicate a "settled" dispute when the limited resources could be used to resolve controversies of genuine interest to the parties.

The recent pronouncement of the Board in *United Technologies Corp.*, 268 NLRB No. 83 (1984), may presage a more realistic approach toward private resolution of disputes than that followed in this case. Such a reassessment of priorities is in the public interest and is to be encouraged.

## II.

In these discharge cases, we review to determine whether Scott or Touchton engaged in sufficiently serious misconduct so as to forfeit the protections of sections 7 and 8 of the National Labor Relations Act, 29 U.S.C. §§ 157, 158, and thus their right to reinstatement. Because the Scott dis-

---

1. The brief for the Board suggests that the settlement was inadequate and did not effectuate the purposes of the Act because it did not provide the discharged employee the full relief available under the Act. This argument overlooks the fact that, as here, the claimant may not succeed on the merits. As the Court of Appeals for the First Circuit recently noted:

> "It seems to us, however, that neither the ALJ nor the Board considered the fact that at the time the agreement was made neither [claimant] had any established rights to reinstatement. . . .

> All of the uncertainties of an adversary hearing, . . . stood between [the claimants] and an unconditional reinstatement.

> If, as indicated by the ruling in this case, it is the policy of the Board to reject strike settlement agreements in all cases which cannot otherwise be faulted solely because the agreements did not provide all that the employees might have ultimately gotten by litigation, then the Board has removed any incentive on the part of the employer to bargain on reinstatement issues."

*Hotel Holiday Inn*, 723 F.2d at 172–73.

charge was the more hotly contested of the two cases, we will discuss it first.

Reduced to its essentials, the ALJ's reasoning was that because Talamonti was the aggressor, Scott would have been justified in the use of a knife. That being so, the ALJ saw no need for specific findings on whether Scott did in fact use that weapon, and instead concluded that under either view of the facts the discharge was improper.

The Board, in affirming the ALJ's reinstatement decision, did not engage in fact finding or extensive legal reasoning. Its decision refers to a "supposed" knife fight and appears to be based on the premise that the ALJ "discredited Respondent's version of the knife fight."

The ALJ's decision is not a model of clarity, but it does not, contrary to the Board's appraisal, reflect a repudiation of the company's view of the incident. Talamonti's version of the confrontation, including Scott's knife attack, was discussed in a part of the ALJ's opinion entitled "Respondent's Version." At the end of this section, the ALJ wrote, "The above-credited testimony is the result and product of the testimony not only of General Counsel's witnesses, including Scott, but James Latta, III, Oestreich and employee Ranieri."

As described by the ALJ, Ranieri testified "that he saw Scott holding a knife in his right hand.... Ranieri [also] insisted that he saw Scott lunge at Talamonti with the knife." In a later section of the opinion, labeled "General Counsel's Witnesses," the ALJ discussed testimony of union witnesses implying that Ranieri was not in a position to observe the Scott incident. The ALJ wrote, "The evidence shows, however, that no General Counsel's witness could state where Ranieri actually was and did not successfully contradict Ranieri's testimony. I find that Ranieri in any event saw the above-described knife fight."

The ALJ's statements are inconsistent with anything other than a finding that Ranieri was present and saw Scott with a knife. They are also completely at odds with the Board's labeling the incident as a "supposed" knife attack. Moreover, the description of the event given by Ranieri, who, along with Scott, picketed the company, is consistent with the testimony of Latta, the terminal manager, and Oestreich, a supervisor.

Contrary to the Board's opinion, the ALJ did not "discredit" the employer's version of the "knife fight." A close reading of the ALJ's decision reveals nothing to suggest that he believed that Scott did not have a knife. Indeed, the finding that Ranieri saw the "above-described knife fight" leads to the opposite conclusion. If the ALJ made any finding at all on this matter, it is that Scott used a knife during his scuffle with Talamonti.

Despite these strong intimations in the opinion, the ALJ avoided, for whatever reason, making a specific finding on this point. Instead, he chose to rely on justification for the use of a deadly weapon.

The ALJ conceded that in view of the strike violence and "the threat against his family, Talamonti was not without emotional justification in returning to assault Scott, ... [but] he had no legal right after 15 minutes of hiatus" to do so. The ALJ also said, "that Scott with too many beers, may have acted with excess force ... is not the issue."

The ALJ and the Board did not cite any law in support of the decision that Scott's use of a deadly weapon was justified under the circumstances. Nor does the National Labor Relations Act purport to specifically address the legal standards governing strikers' conduct, particularly with respect to a reasonable response to provocation.

■ Such conduct, however, does not go unregulated by society. State criminal law provides a guide to measure the propriety of the conduct at issue here. In such circumstances, it is not for the Board to set less stringent standards, but to observe those already in existence. As the Supreme Court has consistently stated in preemption cases, federal labor laws do not protect acts of violence that give rise to liability under state law. *See, e.g., Farmer*

*v. United Brotherhood of Carpenters & Joiners*, 430 U.S. 290, 299–300, 97 S.Ct. 1056, 1063, 51 L.Ed.2d 338 (1977). *See also*, *NLRB v. Fansteel Metallurgical Corp.*, 306 U.S. 240, 252–255, 59 S.Ct. 490, 494–496, 83 L.Ed. 627 (1939), *cited in McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973).

■ The Act's purpose is to reduce industrial strife and promote the orderly and peaceful resolution of disputes, 29 U.S.C. §§ 141(b), 151, a goal not inconsistent with the basic tenets of criminal law. *Cf. Southern Steamship Co. v. NLRB*, 316 U.S. 31, 62 S.Ct. 886, 86 L.Ed. 1246 (1942); *Oneita Knitting Mills, Inc. v. NLRB*, 375 F.2d 385, 391–92 (4th Cir.1967). Indeed, the Act was in part a response to violence, including violations of local criminal law left unpunished by federal authorities. *Compare* H.R.Rep. No. 245, 80th Cong., 1st Sess. 27 (1947), *reprinted in* 1 LEGISLATIVE HISTORY OF THE LABOR MANAGEMENT ACT, 1947, at 318 (1948) [hereinafter cited as HISTORY OF ACT] (report criticizes Board reinstatement decision distinguishing between minor and major crimes) *with* H.R.Rep. No. 510, 80th Cong., 1st Sess. 39 (1947), *reprinted in* HISTORY OF ACT at 543 (specific language to repudiate criticized decision eliminated as too limiting and unnecessary in view of recent case law). *See also, Automobile Workers v. Russell*, 356 U.S. 634, 647–49, 78 S.Ct. 932, 940–941, 2 L.Ed.2d 1030 (1958) (Warren, C.J., dissenting). The 1947 legislation added a proscription against reinstatement by Board order of an individual who has been "discharged for cause." 29 U.S.C. § 160(c) (1976). *Cf. Schreiber Manufacturing, Inc. v. NLRB*, 725 F.2d 413 (6th Cir.1984).

In the case at hand, the events giving rise to Scott's discharge occurred in Pennsylvania. We therefore look to that state's criminal law as an aid in determining whether Scott's conduct was a justifiable response to Talamonti's provocation.

In *Commonwealth v. Jones*, 231 Pa.Super. 300, 332 A.2d 464 (1974), the Superior Court of Pennsylvania held that in order to qualify for a claim of self-defense a person confronted with non-deadly force must not use excessive force in retaliation. In that case, several youths had thrown stones and other objects at the defendant's house. Although the police had been notified, the defendant, who had had a prior encounter with one of the rock throwers, left his porch and engaged in a scuffle. The defendant was knocked to the ground and as he arose brandished a knife and slashed his assailant.

The court sustained a conviction of aggravated assault. It held that to establish self-defense, the defendant must reasonably believe that the use of force is "immediately necessary"; he must not have provoked the use of force against him or violated his duty of retreat; and he cannot use deadly force except to protect against death or serious bodily injury. The court held that wielding a knife amounts to deadly force, and it was not justified under the circumstances. 231 Pa.Super. at 305–05; 332 A.2d at 466. *See also Commonwealth v. Fisher*, 491 Pa. 231, 420 A.2d 427 (1980); *Commonwealth v. Johnston*, 438 Pa. 485, 263 A.2d 376 (1970); *Commonwealth v. Sacco*, 98 Pa.Super. 347 (1929).

The case at bar is factually similar to *Jones*. The record reveals that at the time Scott confronted Talamonti, two strikers were in the camper and a union official was standing just outside the door. Also close by were Ranieri and another striker. Latta was arriving on the scene in an attempt to calm down Talamonti. Thus, at least five men were close at hand whom Scott could regard as allies, in addition to Latta who was intent on preventing a fight.

■ Scott did not remain inside the camper but opened the door and hurled an obscenity at Talamonti. Instead of seeking help from his allies, he armed himself with a knife. At that point, Talamonti appeared unarmed and outnumbered. Under these circumstances, Scott was not justified in using a deadly weapon. As a matter of law, its use was unreasonable and clearly

excessive. The Board erred in adopting the ALJ's decision to the contrary.

■ The Board also found that the state court's finding of contempt "does not relate to the issue of whether ... Scott's conduct was sufficiently egregious" to deny him the protection of the Act. We agree that the Board is not bound by this finding of contempt. In that respect, this case is similar to the situation presented in *NLRB v. W.C. McQuaide, Inc.*, 552 F.2d 519, 526 (3d Cir.1977), where we held that a contempt citation did not bind the Board because the trial court made no specific findings of fact in issuing its decision. Here, the Court of Common Pleas did not hold an extensive hearing or make factual findings before entering an order agreed on by counsel and consented to by the individual defendants. In such circumstances, the court order does not conclusively determine what specific acts gave rise to the contempt finding.

■ We cannot accept, however, the Board's expansive language that a contempt finding "does not relate to" whether conduct is sufficiently egregious to deny reinstatement. Willful disobedience of an injunction issued by a state court of general jurisdiction is a factor to be considered in evaluating an employee's conduct.

The Court of Appeals for the Sixth Circuit stated that not every violation of a court order justifies a denial of reinstatement. However, the "effect of intimidation, verbal assaults and threats on the part of [striking employees] all in contravention of the clearly defined court order, manifestly provided a justifiable basis on which to deny reinstatement." *Federal Prescription Services, Inc. v. NLRB*, 496 F.2d 813, 818 (8th Cir.1974). *See also North Cambria Fuel Co., Inc. v. NLRB*, 645 F.2d 177, 182 (3d Cir.), *cert. denied*, 454 U.S. 1123, 102 S.Ct. 970, 71 L.Ed.2d 110 (1981) (discharge of employees upheld when they engaged in rock throwing, were held in contempt, and pleaded guilty to charge of disorderly conduct).

■ In short, it is inappropriate for the Board to condone conduct generally violating court orders or amounting to contempt of court. Although not always controlling, that fact should be taken into account at the reinstatement hearing. Otherwise, the Board promotes disrespect for tribunals with more extensive powers and more comprehensive concerns than its own. Nor should the Board have overlooked Scott's presence in the courtroom at the contempt hearing. He was asked personally by the trial judge if he had heard the allegations, which included the May 31 knife incident, and whether he agreed to the contempt finding. At no time during these proceedings did Scott deny that he had used a knife.

In view of the Board's erroneous conclusion on the knife fight, we need not discuss its failure to make findings on the testimony that Scott had engaged in other strike misconduct including making threats to customers. The ALJ did not go into this matter because he concluded that the employer relied on the knife fight alone—an assertion respondent denied several times during the hearing.

■ To summarize, in using a deadly weapon unjustified in the circumstances, Scott was guilty of actions that permitted denial of reinstatement. Consequently, General Counsel failed to meet its burden of proving that Scott did not engage in serious strike misconduct. *See North Cambria Fuel v. NLRB*, 645 F.2d at 182–83.

### III.

The facts in the Touchton incident are not in dispute. The question is the legal effect to be given to the arson threat. We have no difficulty with the issue because the standard that this court follows was set out clearly in *NLRB v. W.C. McQuaide, Inc.*, 552 F.2d 519 (3d Cir.1977). *See also, Chevron U.S.A., Inc. v. NLRB*, 672 F.2d 359, 361 (3d Cir.1982). The test, an objective standard, is "whether the misconduct is such that, under the circumstances existing, it may reasonably tend to coerce or

intimidate employees in the exercise of rights protected under the Act." 552 F.2d at 528.

 Here, as in *McQuaide*, "[i]n the context of this strike, which was marked by incidents of vandalism and harassment, and under the circumstances in which threats were made," we conclude that Touchton's conduct "was not merely spontaneous picket line activity." *Id.* Rather, his arson threat was sufficiently intimidating so as to constitute conduct justifying his discharge within the standard of *McQuaide*.

Rather than follow our decision in *McQuaide*, the Board attempted to distinguish it. The effort is unconvincing. In reality, the Board chose to adhere to the guidelines it articulated in its own *McQuaide* decision, 220 NLRB 593 (1975), a standard we rejected on review, 552 F.2d at 527.

Under the test the Board applied, threats had to be accompanied by physical acts or gestures "that would provide added emphasis or meaning." After argument of this case before us, the Board overruled its own decision in *McQuaide* and agreed that it had erred in not adopting the standard we had set out in our *McQuaide* opinion. *See Clear Pine Mouldings, Inc.*, 268 NLRB No. 173 (1984). Although that development is a welcome one, it comes too late to avoid the long drawn out proceedings in this litigation and other cases.

It is unfortunate that prior to *Clear Pine*, the Board, in adjudicating cases arising in this Circuit, chose to not follow our *McQuaide* decision. We have previously advised the Board that, as set out in our Internal Operating Procedures, a panel of this court is bound by the holdings of a previous panel. We have made it crystal clear that a Board's decision ignoring our precedents will not be enforced. *Allegheny General Hospital v. NLRB*, 608 F.2d 965, 970 (3d Cir.1979). We are well aware

that the Board is not a court and that its relationship is different from the one between this court and a district court. Nevertheless, Congress has entrusted the power and authority to conduct judicial review in this court. That assignment is not a meaningless one; we do not propose to abdicate our responsibility to an administrative agency.

In its brief here, the Board argues that because its orders may be subjected to review in more than one judicial circuit, *see* 29 U.S.C. § 160(e), (f) (1976), it should not be bound by the precedents of any one court of appeals. That contention is unconvincing because the Board concedes that its "longstanding practice has been to file applications for enforcement of its orders only in the circuit in which the unfair labor practice occurred." Brief for the NLRB at 27 n. 11. Although a private party might be able to shop in two or three jurisdictions under section 160(f), the Board could not be faulted for following the law in the circuit in which it would file for enforcement. We note that the Tax Court also operates on a national basis but has adopted a policy of following the precedents of the court of appeals in the relevant circuit without apparent difficulty. *Golsen v. Commissioner*, 54 T.C. 742 (1970), *aff'd on other grounds*, 445 F.2d 985 (10th Cir.), *cert. denied*, 404 U.S. 940, 92 S.Ct. 284, 30 L.Ed.2d 254 (1971).

The problem of unnecessary and repetitious litigation by administrative agencies is not a new one and has been the subject of comment before. *See Goodman's Furniture Co. v. United States Postal Service*, 561 F.2d 462, 465–66 (3d Cir.1977) (Weis, J., concurring), *cited in Kuehner v. Schweiker*, 717 F.2d 813, 818 n. 2 (3d Cir. 1983). The increasing burden that such litigation places on the federal appellate courts and the additional cost to the government, as well as the citizenry, is an appropriate subject for congressional scrutiny.[2]

**2.** At the Senate Hearings on Civil Case Backlogs, held on November 8, 1983, Senator Dole remarked:

"[T]here are those in [Congress] who believe that caseloads notwithstanding—our system already has too many judges. The only alter-

In summary, we conclude that Touchton's threat falls within the guidelines set by us in *McQuaide* and that the actions by Scott were unjustified. The company did not violate the Act in discharging these two men.

The petition for enforcement will be denied.

native to more judges is the reform of structural deficiencies in our system that encourage needless filings and impede the progress of hard-working judges who desire to minimize docket delays."