OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

TNS, Inc., Johnny Bettis, et al., Intervenors.

OIL, CHEMICAL AND ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 85–1459, 85–1740.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 3, 1986.

Decided Dec. 2, 1986.

Helen de Haven, Knoxville, Tenn., for petitioner in Nos. 85–1459 and 85–1740.

John D. Burgoyne, Asst. Gen. Counsel, N.L.R.B., with whom Robert E. Allen, Associate Gen. Counsel and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., were on brief for respondent in Nos. 85–1459 and 85–1740.

William Merrill Earnest, with whom Robert L. Thompson, Atlanta, Ga., David A. Grant and Betty Southard Murphy, Washington, D.C., were on brief for intervenor, TNS, Inc., in No. 85–1459.

William Shaw entered an appearance for intervenors, Johnny Bettis, et al., in No. 85–1459.

Before EDWARDS, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, we are called upon to review a series of orders by the National Labor Relations Board ("NLRB" or the "Board"). Over the objection of the Board's General Counsel, the NLRB approved private settlement agreements disposing of certain unfair labor practice charges against TNS, Inc. (the "Company"). The settlement agreements were signed by TNS and fifty-six individual employees, all of whom were members of a bargaining unit represented by the petitioner, the Oil, Chemical and Atomic Workers International Union, AFL–

CIO (the "Union"). The Union neither participated in the negotiations leading to the settlement agreements nor approved the terms of settlement. Because we find that the Board failed to explain its departure from established precedent in approving the private settlements, we remand the case to the Board for further proceedings.

## I. BACKGROUND

### A. *Factual Background*

TNS, Inc., an intervenor in this appeal, operates a plant in Jonesboro, Tennessee. In 1981, when the present dispute arose, TNS produced various forms of ammunition made from depleted uranium. Approximately one-hundred employees of TNS were members of the bargaining unit represented by the Union.

On May 1, 1981, bargaining unit employees began a work stoppage allegedly in protest over health and safety conditions at the TNS plant. After closing down operations for several months, the Company hired permanent replacements for the "striking" workers. This action prompted the Union to file unfair labor practice charges with the NLRB.

The Union charges to the Board alleged that the permanent replacement of workers engaged in a work stoppage under section 502 of the Labor Management Relations Act[1] violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act ("NLRA" or the "Act").[2] Section 502 provides that the good faith "quitting of labor" because of abnormally dangerous working conditions shall not be deemed a "strike" under the Act. Under established principles of labor law, workers who strike in response to an employer's unfair labor practices normally may not be permanently replaced.[3] Under the Union's theory of the case,

workers who engaged in a work stoppage pursuant to section 502 should be deemed the equivalent of unfair labor practice strikers, in which case the employer would violate the Act by hiring permanent replacements. In August of 1982, the NLRB's General Counsel adopted the Union's theory and brought an unfair labor practice complaint against TNS.[4]

While the General Counsel was presenting its case before an Administrative Law Judge ("ALJ"), seventy of the "striking" employees, represented by attorney William Shaw, moved to intervene in the proceedings. Intervention was granted for the limited purpose of allowing Shaw to question certain employees about working conditions at the TNS plant, and perhaps to introduce an expert witness.[5]

At some point thereafter, however, Shaw and TNS began negotiations on a possible settlement of the unfair labor practice charges. At the conclusion of the hearings, Shaw and counsel for TNS presented signed settlement agreements to the ALJ for her approval.[6] Under the terms of the settlement agreements, the employees were each to receive a lump-sum payment of between $2,000 and $12,000. In return, the employees agreed to withdraw from the unfair labor practice proceedings, to waive all future legal claims against the Company, and to waive any right to reinstatement. The monetary payments plainly were not to be considered backpay within the meaning of the Act. Rather, by agreement, the Company and employees specified that the settlement payments were given solely in consideration for the employees' releases of potential personal injury claims arising from their exposure to hazardous conditions at the TNS plant. The Company also agreed to pay Shaw

---

**1.** 29 U.S.C. § 143 (1982).

**2.** *Id.* § 158(a)(1), (3).

**3.** *See Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956).

**4.** Complaint and Notice of Hearing, *reprinted in* Joint Appendix ("J.A.") 176.

**5.** *See* J.A. 293–94.

**6.** At that point, 42 TNS employees had signed settlement agreements. Fourteen employees have signed since, bringing the total to 56.

attorney's fees of $450 for each employee who signed a settlement agreement.[7]

The ALJ refused to approve the settlement agreements. She found that Shaw, in being permitted to intervene, had not been granted "standing" to settle the claims of the individual employees.[8] Nor did the employees themselves have "standing" apart from their exclusive representative, the International Union.[9] The ALJ also expressed "very serious concerns" regarding the content of the agreements and the manner in which they had been negotiated; in particular, she questioned the propriety of Shaw's attorney's fees and the adequacy of Shaw's legal representation.[10]

### B. *The Board's Orders*

In its first in a series of three orders, the Board reversed the ALJ's decision to reject the settlements, and approved them "in principle." [11] It remanded for an additional hearing, however, on the issue of whether the employees had entered into the agreements with voluntary and informed consent. In approving the agreements in principle, the Board rejected the Union's request to examine whether Shaw's actions in negotiating the settlements had been unethical, reasoning that it was not the Board's "function or responsibility to pass on the ethical propriety of an attorney's conduct." [12]

Two months later, the Union, the Company and the individual employees filed a joint motion with the Board stipulating that the employees had executed the settlement agreements with voluntary and informed consent.[13] Accordingly, the parties asked the Board to approve the agreements without a further hearing. The General Counsel objected, arguing, *inter alia*, that the agreements did not meet the standards articulated by the Board in *Community Medical Services, Inc. ("Clear Haven"),* 236 N.L.R.B. 853 (1978).[14]

On May 16, 1985, the Board approved the settlement agreements over the General Counsel's objections.[15] On October 23, 1985, however, the Board amended its two earlier orders *sua sponte*. In its amended order, the Board elaborated on its reasons for approving the settlements. Citing its decisions in *Combustion Engineering Inc.*[16] and *Coca-Cola Bottling Co.*,[17] the Board explained that it had a "long-standing policy of encouraging resolution of disputes without resort to Board processes." [18] Approval of the agreements was thus "in effect" a *deferral* to private, non-Board settlements, fully consistent with the "general principle which favors settlement over litigation wherever possible." [19]

The Board went on to cite four reasons why giving effect to the proposed settlement agreements would "effectuate the policies of the Act." [20] First, the legal and policy issues raised by the unfair labor

---

7. *See* Settlement Agreement, Release and Covenant Not to Sue; Severance Agreement, Release and Covenant Not to Sue, *reprinted in* J.A. 13–22.

8. *See* J.A. 357.

9. *Id.*

10. *See* J.A. 358–75.

11. Telegraphic Order of the Board (Feb. 22, 1985), *reprinted in* J.A. 1.

12. *Id.*

13. Joint Motion of Charging Party, Respondent, and Intervenors for Amendment of Board's Order and to Approve Settlement Agreements and Releases, *reprinted in* J.A. 6.

14. General Counsel's Opposition to Joint Motion of Charging Party, Respondent, and Intervenors for Amendment of Board's Order and to Approve Settlement Agreements and Releases, *reprinted in* J.A. 23–32.

15. Telegraphic Order of the Board (May 16, 1985), *reprinted in* J.A. 2.

16. 272 N.L.R.B. 215 (1984).

17. 243 N.L.R.B. 501 (1979).

18. Unpublished Order of the Board (Oct. 23, 1985), *reprinted in* J.A. 3, 4.

19. J.A. 4.

20. J.A. 5.

practice complaint were "novel."[21] Second, the parties had stipulated that the agreements were executed with voluntary and informed consent. Third, the legal issue presented by the unfair labor practice complaint was preserved because not all of the employees had agreed to the settlement.[22] Fourth, there was a risk, inherent in litigation, that the employees might not prevail on the merits. Accordingly, the Board approved the settlements and dismissed the unfair labor practice complaint insofar as it alleged a violation of the Act in connection with the fifty-six employees who had executed settlement agreements.[23] The Union, the exclusive bargaining representative for all of the "striking" employees, filed this petition for review of the Board's orders.

## II. DISCUSSION

### A. *Departure from Precedent*

In *Clear Haven*, the Board outlined the "well settled," and relatively stringent, two-part legal test to be applied in determining "whether or not to approve a settlement agreement and withdrawal of unfair labor practice charges."[24] First, the Board will assume that the case is meritorious and that the General Counsel is prepared to carry her burden of proof.[25] Second, the Board will determine whether the settlement agreement "substantially remed[ies]" the alleged unfair labor practices.[26] Among the most important of the considerations in assessing whether a settlement agreement substantially remedies the alleged unfair labor practices is a determination whether the agreement provides for traditional Board remedies such as reinstatement, backpay and the posting of a notice.[27] The absence of such remedies will strongly militate against the Board's approval of a proposed settlement.

■ The Board's policy against deference to private settlement agreements is grounded on the well-accepted principle that the Board, having filed an unfair labor practice complaint, proceeds in vindication of the public interest, *not* in vindication of private rights.[28] Therefore, a settlement that seeks dismissal of an unfair labor practice complaint will not be found to be acceptable merely because the private parties to the labor dispute are satisfied with its terms. Rather, the Board must pursue the *public's* interest in discouraging unfair labor practices by ensuring that those practices have been substantially remedied. As the Board observed in *Clear Haven*, "there is an overriding public interest in the effectuation of statutory rights which cannot be cut off or circumvented at the whim of individual [employees]."[29]

---

**21.** J.A. 4.

**22.** Because not all employees have signed settlement agreements, the ALJ must still rule on the legal question whether employees who engage in a work stoppage over hazardous working conditions may be permanently replaced. At oral argument, counsel informed us that a decision on this question is still pending before the ALJ.

**23.** Unpublished Order of the Board (Oct. 23, 1985), *reprinted in* J.A. 3, 5.

**24.** 236 N.L.R.B. at 853.

**25.** *Id.* at 855–56.

**26.** *Id.* at 853 (quoting *Jack C. Robinson*, 117 N.L.R.B. 1483, 1485, *enforced*, 251 F.2d 639 (3d Cir.1957)).

**27.** *Id.* at 854; *see also APD Transport Corp.*, 253 N.L.R.B. 468, 470 (1980) (under *Clear Haven*, failure of settlement agreement to provide for backpay and reinstatement falls "far short" of a "substantial remedy"), *enforcement denied on other grounds*, 672 F.2d 323 (3d Cir.1982).

**28.** The Board has ... long recognized that the willingness of a charging party to withdraw charges is not necessarily a ground for dismissal of a complaint "for once a charge is filed, the General Counsel proceeds, not in vindication of private rights, but as the representative of an agency entrusted with the power and the duty of enforcing the Act in which the public has an interest." *Clear Haven*, 236 N.L.R.B. at 853 (quoting *Ingalls Steel Constr. Co.*, 126 N.L.R.B. 584 n. 1 (1960)).

**29.** 236 N.L.R.B. at 855; *see also Ideal Donut Shop*, 148 N.L.R.B. 236, 237 (1964) ("[R]einstatement and backpay are remedies which the Board provides in the public interest to enforce a public right. No private right to such relief

■ In its three orders in this case, the Board made no attempt either to apply the above principles, or to reassess the standards it will use in determining whether to approve a private settlement of an unfair labor practice complaint. Indeed, the Board approved the settlements without any reference whatsoever to its *Clear Haven* precedent. In so doing, the Board approved settlement agreements that provided for *none* of the traditional remedies ordered by the Board for unfair labor practices. It goes without saying that the Board failed in its recognized obligation to ensure that unfair labor practices have been *substantially* remedied.

In support of its final order, the Board emphasized that the General Counsel's unfair labor practice complaint was "novel," and that there was a risk that the complaint would be found unmeritorious. Yet, under the *Clear Haven* test, for the limited purpose of passing on the acceptability of a proposed settlement, the Board must "of necessity" begin with the assumption that the case *is* meritorious.[30] In the instant case, the Board made no attempt to explain its departure from this well-established principle.

In further support of its final order, the Board cited two cases purportedly illustrative of the Board's "long-standing policy of encouraging resolution of disputes without resort to Board processes."[31] Both cases, however, involved settlement agreements negotiated by the *union* and the employer *pursuant to an established grievance-arbitration procedure.*[32] In deferring to the settlements in those cases, the Board was promoting the use of the grievance-arbitration process as a means of resolving disputes under the parties' collective bargaining agreement, a recognized policy of the Act.[33] Here, in contrast, the Board deferred to settlement agreements negotiated by the Company and its *individual employees* in derogation of the bargaining relationship between the Company and the Union. The Board failed to identify any policy of the Act that is furthered by deferral under such circumstances. Nor was the Board able, in its brief or at oral argument, to cite a single case in which the Board has deferred to a settlement between an employer and its individual employees over the opposition of the employees' exclusive bargaining representative.

In summary, the Board's "well settled" standards for assessing private settlement agreements such as those reached in this case were delineated in *Clear Haven.* In this case the Board departed from those standards without explanation (and without even citing *Clear Haven*). We need hard-

attaches to [an employee] which he can bargain away or compromise...."), *enforced,* 347 F.2d 498 (7th Cir.1965).

As this Board precedent makes clear, it is largely irrelevant that some of the "striking" employees have chosen not to settle, thereby preserving for the ALJ the legal question whether employees who engage in a work stoppage over hazardous working conditions may be permanently replaced. The public interest lies not only in resolving the legal issues raised by an unfair labor practice complaint, but in *remedying* the illegal practices, thereby discouraging their recurrence.

**30.** 236 N.L.R.B. at 855–56.

**31.** Unpublished Order of the Board (Oct. 23, 1985), *reprinted in* J.A. 3, 4.

**32.** *See Combustion Eng'g Inc.,* 272 N.L.R.B. 215 (1984) (agreement between union and employer to settle employee's grievance short of arbitra-

tion); *Coca-Cola Bottling Co.,* 243 N.L.R.B. 501 (1979) (same).

**33.** *See, e.g., Alpha Beta Co.,* 273 N.L.R.B. 1546, 1547 (1985) (Board furthers fundamental purposes of the Act by encouraging employers and unions to negotiate their differences, to discuss and settle grievances, and, if necessary, to arbitrate their differences), *appeal docketed sub nom. Mahon v. NLRB,* No. 85–7565 (9th Cir. 1985); *Roadway Express, Inc. v. NLRB,* 647 F.2d 415, 426 (4th Cir.1981):

[D]eferring to the [grievance] settlement in this case, effected by the union's representative ... would not be repugnant to the national labor policy of respecting agreements freely made between an employee and employer, where such agreement had been effected under the protection of the employee's bargaining agent.... That certainly is promoting the use of the collective bargaining agent in resolving peaceably and amicably grievances and this is one of the primary purposes of the National Labor Relations Act.

ly elaborate on the settled principle that an agency may not depart from its precedent without explaining and justifying its change in position.[34] We therefore remand this case to the Board "for further consideration (or explanation)" of its reasons for approving the private settlement agreements.[35]

### B. *The Issues to be Addressed on Remand*

Apart from the Board's departure from well-established precedent, the orders here under challenge raise several additional concerns. We will briefly highlight these matters so that they, too, will be addressed by the Board on remand.

First, we find it disturbing that the Board foreclosed all inquiry into the ethical conduct of the attorney for the individual employees, who was paid $450 *by the Company* for each employee who signed a settlement agreement. Had the Company made such payments to a Union attorney, it surely would have been guilty of an unfair labor practice.[36] Payments by the Company to an independent attorney acting in place of the employees' duly authorized bargaining agent raise equal, if not height-

ened, concerns. At a minimum, in discharging its responsibility for approving the settlements, the Board had an obligation to ensure that the agreements were not procured through unethical attorney conduct.[37]

Second, we find it highly questionable—especially outside the grievance-arbitration context—for the Board to approve settlements and dismiss unfair labor practice charges *merely* on a showing that the settlements were "voluntary." As noted in *Clear Haven,* the Board is the "agency entrusted with the power and the duty of enforcing the Act in which the public has an interest." [38] We think this duty to the public is abdicated where the Board makes absolutely no inquiry into the terms on which the unfair labor practices have been settled. If the Board is not going to insist that the settlements provide "substantial" relief for the unfair labor practices—as mandated by *Clear Haven*—it must, at a minimum, inquire into whether the settlement terms are reasonable.[39]

Along these lines, we find it especially disturbing that the settlements in this case provided no remedy whatsoever for the

---

**34.** *See, e.g., Columbia Broadcasting Sys. v. FCC,* 454 F.2d 1018, 1026 (D.C.Cir.1971) ("[W]hen an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuring that it is faithful and not indifferent to the rule of law.") (footnote omitted); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970) ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute.") (footnotes omitted), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).

**35.** *See Darr v. NLRB,* 801 F.2d 1404, 1409 (D.C. Cir.1986) (remanding for further consideration or explanation of Board's decision to defer to an arbitrator's award).

**36.** Section 8(a)(2) of the Act makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute finan-

cial or other support to it." 29 U.S.C. § 158(a)(2) (1982).

**37.** *See, e.g., NLRB v. Autotronics, Inc.,* 596 F.2d 322, 325 (8th Cir.1979) (refusing to enforce Board order where Board failed to give "meaningful consideration" to charges that a settlement was procured by the unethical conduct of a Board attorney); *Feld & Sons, Inc.,* 263 N.L.R.B. 332, 337–38 (1982) (in response to charges that attorney misconduct infected the settlement process, Board remands to administrative law judge "for the purpose of taking testimony concerning the circumstances surrounding the execution of the Settlement Agreement").

**38.** 236 N.L.R.B. at 853 (quoting *Ingalls Steel Constr. Co.,* 126 N.L.R.B. 584 n. 1 (1960)).

**39.** In this respect, we find the Board's duty at least as great as that of a district court judge charged with the responsibility for approving class action settlements. *See* FED.R.CIV.P. 23(e); *Armstrong v. Board of School Directors,* 616 F.2d 305, 313 (7th Cir.1980) (district court may approve class action settlement only if it finds settlement "fair, reasonable and adequate").

Company's alleged unfair labor practices. The monetary payments received by the employees were solely in consideration for the release of personal injury claims; the employees received neither reinstatement nor backpay (nor any other consideration) for the dismissal of their unfair labor practice charges. So far as we can discern, the Board has never, even in the grievance-arbitration context,[40] approved a settlement providing *no remedy* for an alleged unfair labor practice. Board counsel could cite no such authority.

### III. Conclusion

For the foregoing reasons, the orders of the Board are reversed, and the case remanded to the Board for further proceedings not inconsistent with this opinion.

*So Ordered.*

---

**40.** *See, e.g., Combustion Eng'g Inc.,* 272 N.L.R.B. 215 (1984) (both company and union made concessions to settle employee's grievance; employ-ee was reinstated but without backpay); *Coca-Cola Bottling Co.,* 243 N.L.R.B. 501 (1979) (same).